STATE EX REL. DeLuca, Appellant, v. COMMON COUNCIL OF CITY OF FRANKLIN, Respondent.

*No. 92 (1974). Argued April 8, 1976.—Decided June 2, 1976.*
(Also reported in 242 N. W. 2d 689.)

For the appellant there was a brief by *James R. Glover* and *Hauser, Glover & Webb, S. C.*, of Madison; *Coffey, Murray & Coffey*, of Milwaukee, and oral argument by *James R. Glover*.

For the respondent there was a brief by *Ray T. McCann* and oral argument by *John T. McCann*, both of Milwaukee.

HEFFERNAN, J.   Ben DeLuca served as the city clerk for the city of Franklin from January 16, 1966, to September 5, 1972, on which date he was suspended by the mayor following the adoption of a resolution passed by the common council to initiate his removal. On September 25, 1972, a verified petition setting forth alleged grounds for removal was filed with the common council by Harold D. Robertson, president of the common council. A hearing on these charges was held by the common

council on November 13, 14, and 15, 1972. On January 3, 1973, the council issued an order removing DeLuca from office. DeLuca sought to have the common council's action reviewed by writ of certiorari in the circuit court for Milwaukee county. The writ was issued on July 2, 1973; and on January 21, 1974, following a hearing on the city of Franklin's motion to quash, the circuit court issued an order quashing the writ. The appeal is from that order.

The fundamental issue presented in DeLuca's application for certiorari and the issue before us on this appeal is whether the investigatory and adjudicatory functions were so intermingled in these removal proceedings that DeLuca was denied due process.

The basic contention of DeLuca is that Alderman Robertson, by his participation in the investigatory stage of the proceedings, together with his having filed a verified petition with the council for DeLuca's removal, should have been disqualified from presiding over the common council's hearing on the removal and from voting on the proceedings. We conclude that DeLuca was not denied due process and the order quashing the writ of certiorari is affirmed.

Since this case is before us on certiorari, we are confined to the record, and the scope of review is limited to the issues set forth in *State ex rel. Ball v. McPhee* (1959), 6 Wis. 2d 190, 94 N. W. 2d 711. Therein we said that this court on review is limited to the consideration of the following questions:

" '(1) Whether the board kept within its jurisdiction; (2) whether it proceeded on correct theory of the law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question.' " *Ball,* page 199.

The removal of DeLuca was carried out under the provisions of sec. 17.16, Stats. This statute provides that an officer of a municipality having the status of DeLuca can only be removed for cause. Section 17.16 (2) defines "cause" as "inefficiency, neglect of duty, official misconduct or malfeasance in office." Removal, however, may be effected only after written verified charges have been preferred by "a taxpayer and resident of the governmental unit" and only after a speedy public hearing, at which the officer is entitled to be heard personally and by counsel.

Section 17.16 (3), Stats., requires that notice of the hearing and of the charges must be given to the officer not less than ten days prior to the hearing. Pending such hearing, the officer may be suspended by the order of the mayor. The body designated to conduct the hearing and which has the removing authority is the common council of the city.

No question is presented in respect to whether the procedures followed by the common council complied with the statutory mandates. It is conceded that they did. DeLuca, however, asserts that the council failed to act in accordance with the guarantees of due process of the Wisconsin and United States Constitutions.

The common council of the city of Franklin asserts, however, that these constitutional provisions are not applicable. It contends that under the circumstances, because DeLuca was deprived of neither liberty nor property, he was not entitled to the full panoply of due-process protections. Due process is a requirement only where state action is involved, but it is clear that a common council, as a creature of the state, is controlled by the strictures of the Fourteenth Amendment. *Hortonville Ed. Asso. v. Joint Sch. Dist. No. 1* (1975), 66 Wis. 2d 469, 487, 225 N. W. 2d 658.

From the face of the statute, it appears that DeLuca had a statutory entitlement to his position and of which he could only be deprived for cause. The United States Supreme Court recently stated in *Goss v. Lopez* (1975), 419 U. S. 565, 573, 95 Sup. Ct. 729, 42 L. Ed. 2d 725:

". . . a state employee who under state law . . . has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process."

The property interest of DeLuca in his employment was one conferred by the law of the state and, as such, is protected by the due-process provisions of both the state and federal constitutions. *See: Board of Regents v. Roth* (1972), 408 U. S. 564, 92 Sup. Ct. 2701, 33 L. Ed. 2d 548; *Perry v. Sindermann* (1972), 408 U. S. 593, 92 Sup. Ct. 2694, 33 L. Ed. 2d 570; *Wieman v. Updegraff* (1952), 344 U. S. 183, 73 Sup. Ct. 215, 97 L. Ed. 216. DeLuca's employment status constituted a property right and is afforded due-process protections.

Additionally, we are satisfied that a discharge for the causes set forth in the statute implicates, in a constitutional sense, the personal liberty of the discharged officer. In *Wisconsin v. Constantineau* (1971), 400 U. S. 433, 437, 91 Sup. Ct. 507, 27 L. Ed. 2d 515, cited with approval in *Roth*, the United States Supreme Court indicated that:

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

*Roth* also indicated that, where there was a stigmatization of an employee that would foreclose his future freedom to take advantage of other employment opportunities, there was a deprivation of liberty. *Roth*, p. 574. The teaching of *Roth* is that liberty in an employment

context is composed of two interests—a reputational interest and an employability interest; and wherever charges might seriously impair one's standing and associations in the community, the reputational interest has been infringed. An infringement upon an employability interest is shown when the reasons for dismissal are those that would significantly undermine opportunities for future employment.

The charges and the subsequent hearing in this case were matters of public knowledge. Among the charges were allegations concerning DeLuca's character—that he was performing services for personal friends but not performing the same services for others. The charges left the implication that he was dishonest in the manner he operated his office. Charges of this nature that reflect or imply unsavory character traits affect the liberty of a public employee. *Hostrop v. Board of Junior College Dist. No. 515 Etc., Ill.* (7th Cir. 1972), 471 Fed. 2d 488.

DeLuca, accordingly, was entitled to the full panoply of due-process protections, the minimum requirements of which include a timely and adequate notice of the reasons for the discharge, an impartial decisionmaker, and the opportunity to confront and cross examine adverse witnesses. From our perusal of the record brought to us on certiorari, we conclude that DeLuca was afforded all of these protections.

DeLuca argues that the notice of charges was not sufficiently detailed to adequately apprise him of the nature of the allegations and that it was impossible for him to defend himself against them. The charges brought before the common council set forth 16 separate items, and prior to the hearing DeLuca specifically answered each charge. Nevertheless, at the inception of the hearing, DeLuca's counsel asked that the charges be made more specific. This motion was denied by the president of the common council on the grounds of untimeliness. In addi-

tion, as the circuit court noted, the drafting of the answer, although such answer was not required by the statutes, was strong evidence that DeLuca was able to meet the charges responsively.

The charges in the instant case are drawn with much greater precision than those approved in *State ex rel. Richey v. Neenah Police & Fire Comm.* (1970), 48 Wis. 2d 575, 180 N. W. 2d 743, and comport with the standards stated in *State ex rel. Messner v. Milwaukee County Civil Service Comm.* (1972), 56 Wis. 2d 438, 202 N. W. 2d 13, in which we said that charges must be:

". . . 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (P. 444)

Moreover, even at this late date, on appeal, counsel for DeLuca, although reasserting the point, makes no attempt to demonstrate that his client's ability to defend himself was in any way impaired by the insufficiency of the charges. We are satisfied that the notice was sufficient.

The most important issue presented in this case is whether, in the factual context of DeLuca's discharge, he was deprived of the due-process right to an impartial tribunal.

Immediately prior to the hearing, DeLuca's counsel requested the disqualification of four of the six common council members on the grounds of bias—the president, Robertson, because he preferred the charges, and the other three aldermen because they had participated in the resolution that initiated the removal proceedings. That motion was denied.

On certiorari, the trial court upheld the ruling of the common council on the theory of necessity—that, if in this case the aldermen were to be disqualified, the only forum authorized by the statute to act would be unable to proceed. For this proposition he relied upon the case

of *Clark v. Blochowiak* (1942), 241 Wis. 236, 5 N. W. 2d 772. He invoked the same doctrine in respect to the specific disqualification alleged in respect to President Robertson. The trial judge pointed out that the statute requires a three-fourths vote of the council members and that, were Robertson disqualified, a unanimous vote of the remaining members would go beyond the statutory requirement. The trial judge on certiorari also stated that, after an examination of the entire transcript, he could not say that either Robertson or the other aldermen were outright biased against the relator.

We conclude that, in respect to this latter test, the trial judge appeared to base his ruling on whether there were actual bias revealed by the record. We believe this test to be incorrect and that actual bias need not be shown. *Withrow v. Larkin* (1975), 421 U. S. 35, 95 Sup. Ct. 1456, 43 L. Ed. 2d 712.

It is appropriate here to further consider the facts as revealed on the record submitted on certiorari. Proceedings were initiated by the motion of Alderman Robertson, the president of the common council, for adoption on September 5, 1972, of the resolution entitled, "Petition to Initiate Removal Procedures and Suspension of City Clerk Ben DeLuca." The resolution was approved by four of the six members of the common council, including President Robertson. Following the passage of this resolution and the suspension of DeLuca, formal written charges were filed with the common council on September 25, 1972, by Robertson. These charges were verified. Robertson stated in the verification:

"[T]hat he has read the foregoing charges and knows the contents thereof; that *the same are true of his own knowledge,* except as to those matters stated on information and belief, and as to those matters he believes them to be true." (Emphasis supplied.)

None of the allegations, however, were made on the basis of information and belief. The preamble to the charges stated that Robertson was filing the charges "as a member of the Common Council of the City of Franklin, and a taxpayer and resident of said city."

Prior to the date of the public hearing, it also appears that President Robertson conducted an *ex parte* investigation. The record is silent in respect to whether this investigation was directed by the common council or was undertaken by Robertson in his individual capacity. At any rate, three of the witnesses who subsequently testified at the hearing were interviewed and their statements taped. These tapes were not made available to DeLuca's counsel, although a request was made for such tapes at the commencement of the council hearing. Neither DeLuca nor his counsel was present at the time of these interviews, and apparently they were given no notice that such interviews were being conducted.

All of the motions made by DeLuca's counsel at the beginning of the hearing were denied. Following the hearing the common council took the removal proceedings under advisement. On January 3, 1973, the council issued the order removing DeLuca from the position of city clerk. Fourteen specific findings were made in respect to DeLuca's conduct, and the order recited that any one of these findings was sufficient to show that DeLuca had operated his office inefficiently, neglected his duties, and was guilty of malfeasance in office.

While we find that some of the objections raised on this appeal were not timely and the others are without merit, DeLuca is correct in contending that an unbiased tribunal is a constitutional necessity in a quasi-judicial hearing and that the denial of such a tribunal is the denial of due process.

The most recent pronouncement in this respect by the United States Supreme Court is *Withrow v. Larkin,*

*supra.* We deem the opinion in that case controlling in respect to the contention that four of the aldermen in this case were disqualified because they had voted for the procedure which initiated the removal of DeLuca and resulted in his immediate suspension by the mayor. We conclude that the four aldermen were not disqualified.

*Larkin* arose out of a disciplinary procedure brought by the Wisconsin Board of Medical Examiners. The Board there conducted an investigation to determine whether Doctor Larkin had engaged in certain acts proscribed by the statutes. It then scheduled a contested hearing to determine whether Doctor Larkin had engaged in unprofessional conduct and whether his license should be temporarily suspended.

The United States District Court enjoined the Board of Medical Examiners from proceeding with the contested hearing. The Board nevertheless issued findings that there was probable cause that Doctor Larkin had committed the acts alleged and referred the matter to the district attorney.

The United States Supreme Court reversed the district court's preliminary injunction, which was based upon what the Supreme Court referred to as:

"[T]he untenable view that it would be unconstitutional for the Board to suspend appellee's license 'at its own contested hearing on charges evolving from its own investigation . . . .'" (P. 55)

In reversing, the Supreme Court put to rest the idea that an adjudicating board could in no case qualify as an independent decisionmaker in respect to the merits of the charges which it initiated and investigated. It seems clear, therefore, that, in this case, DeLuca's contention— that four members of the council were disqualified merely because they had initiated the hearing and the investigation—is untenable.

The Court nevertheless went on to say that not only is a biased decisionmaker constitutionally unacceptable, but, in addition, that the system of due process must endeavor to prevent the probability of unfairness. It is thus apparent that the standard of no actual bias used by the trial judge in the instant case is not the proper test. Circumstances which lead to a high probability of bias, even though no actual bias is revealed in the record, may be sufficient to give the proceedings an unacceptable constitutional taint. *Larkin* indicated that there were two situations that clearly show such a high probability of actual bias as to be constitutionally intolerable, the first being a situation in which the adjudicator has a pecuniary interest in the outcome and the second where the adjudicator has been the target of personal abuse or criticism from the party before him. The record demonstrates that none of the aldermen fit these categories and are not, therefore, *ipso facto* to be held disqualified.

The Court pointed out that, even where the investigative and adjudicative functions are combined, the objector must assume the heavy burden of showing that this combination of functions creates an unconstitutional risk of unfairness.

"[The objector] must overcome the presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Larkin,* page 47.

In *Larkin,* the United States Supreme Court noted that it is typical procedure for members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints, and

then to participate in the ensuing hearings. The Court likened the conduct of administrative adjudicatory agencies in approving or issuing initial charges to the practice of judges in making findings of probable cause. Yet such judges are not constitutionally disqualified from hearing the case on the merits. The Court pointed out, however, that, although there is no *per se* disqualification because of the combining of the investigatory and the adjudicatory functions, special facts and circumstances may in a proper case impel a court to conclude that the risk of unfairness is intolerably high. In explication of this view, the Court stated, in referring to the *Larkin* procedures:

"The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so phychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position. Indeed, just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute. Here, if the Board now proceeded after an adversary hearing to determine that appellee's license to practice should not be temporarily suspended, it would not implicitly be admitting error in its prior finding of probable cause. Its position most probably would merely reflect the benefit of a more complete view of the evidence afforded by an adversary hearing." (P. 57)

It appears from the facts of the case before us that the conduct of the four aldermen who voted for the resolution to initiate the removal procedures was no different than that of the initial function of a judge in finding probable cause or of an administrative agency in approving the filing of charges that are to be the

subject of a subsequent adjudication. We find nothing in the record that indicates the mere initiation of the removal proceedings by aldermen who would subsequently decide the matter after a full blown hearing created special circumstances that would result in an intolerable risk of unfairness.

The serious question remains, however, in respect to whether President Robertson, by actually preferring the charges against DeLuca on the basis of information allegedly within his own knowledge, placed himself in such circumstances that the risk of unfairness in the final adjudication was intolerably high.

As stated above, the exact time sequence of an *ex parte* investigation conducted principally by President Robertson is not revealed by the record, but it appears that, subsequent to the passage of the resolution to initiate the removal proceedings on September 5, 1972, and prior to the common council's hearing, President Robertson, in conjunction with Alderman Daniel, interviewed witnesses who were later called to support the charges at the public hearing. Although it is not clear that the formal charges were the result of this investigation, such charges were apparently signed and filed with the common council subsequent to this *ex parte* investigation.

DeLuca's counsel asserts that there were two fatal defects in this procedure which denied due process to the city clerk. The first is that, unlike the facts in *Larkin*, the investigations were conducted privately, and neither DeLuca nor his counsel had the opportunity to attend. We see nothing in *Larkin* that mandates, as a matter of due process, that the party under investigation must be represented during the investigatory procedure. As will be discussed later, however, due process might require the presentation of statements elicited in such *ex parte* investigations for the purpose of cross-examining witnesses who subsequently appear and testify at the adjudi-

catory proceedings. We conclude that an *ex parte* investigation does not *per se* violate constitutional due process.

It should be further pointed out that these investigatory sessions conducted by President Robertson were after the council's vote to proceed with the removal. The record does not demonstrate whether these investigations were made at the direction of the common council or were solely on the volition of Robertson and Daniel; but in the absence of a strong showing that these investigations were conducted solely as a matter of the will of these two aldermen, it must be presumed as a matter of law that they were carrying out the administrative duties that evolved upon them as members of the common council.

*Larkin* placed much emphasis upon the presumption of honesty and integrity of those who serve as adjudicators in state administrative proceedings. We will not assume, in the absence of proof, that Robertson was merely exercising his will in an effort to "get" DeLuca, rather than carrying out the regularly assigned functions of an investigation that would normally fall upon the presiding officer of a common council.

Great emphasis is also placed by DeLuca on the fact that the charges as finally preferred against him were signed by Robertson in his individual capacity, rather than in his capacity as a member of the common council. The statute provides not that a member of the removing body shall prefer written verified charges, but that such charges must be made by "a taxpayer and resident of the governmental unit." We do not conclude that this statute was intended to preclude a member of a common council from bringing charges. He is, by definition, a resident and taxpayer of his governmental unit. The statute merely makes clear that such charges may be brought by any resident and taxpayer whether he be a

member of the governing body or not. Nevertheless, the combination of bringing the charges and being an adjudicator could result in an intolerably high risk of unfairness if it could be said that this essentially converts the charge bringer into the role of prosecutor. Moreover, *Larkin* points out that there may well be circumstances that:

". . . raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." *Larkin*, page 57.

The only evidence that would tend to indicate such a "psychological wedding" to a predetermined conclusion, even under DeLuca's theory of the case, is that, rather than making the charges on information and belief, Robertson made them under oath as a matter of personal knowledge.

The position of DeLuca on this appeal, therefore, appears to be that, had the charges been made on information and belief, Robertson would have only stated probable cause to believe that the charges were true rather than the fixed conclusion that they were in fact true. DeLuca's brief asserts:

"Clearly, at this point, Chairman Robertson had reached an unequivocal conclusion that Mr. DeLuca had done those things charged and that he should be removed."

We believe that this position exalts form over substance. The document which prefers charges is jurisdictional in nature and merely gives the adjudicatory tribunal the power to proceed. Moreover, the document's main purpose is to give notice of the specific grounds of inefficiency, neglect of duty, misconduct, or malfeasance with which the party is charged. Such notice is

essential for the protection of the individual's right to due process. It is not evidentiary in nature and is not sworn testimony that can be relied upon at the hearing or in a court of law. It is similar to the statement of a cause of action[1] brought by a verified complaint. The fact that the verification is the boiler plate set forth in the Wisconsin statutes and contained the phrase, "except as to those matters stated on information and belief," indicates to this court that the standard verification form was used not for the purpose of attesting to the affiant's fixed beliefs and conclusions, but rather as a method of complying with the jurisdictional requisites set forth in the statutes for a procedure which had already been authorized by the initial resolution of the common council.

We place no special emphasis upon the mere form of a verification. *Federal Trade Com. v. Cement Institute* (1948), 333 U. S. 683, 68 Sup. Ct. 793, 92 L. Ed. 1010, and cited in part with approval in *Larkin,* is instructive on the effect of prior sworn conclusions of adjudicators. In *Federal Trade Commission,* members of the F. T. C. appeared before the Congress and in sworn testimony stated that they were of the opinion that the operation of the basing-point system used by cement manufacturers was a violation of the Sherman Anti-Trust Act. It was alleged that thereafter the F. T. C. could not be an unbiased tribunal. Although the United States Supreme Court concluded that, on the basis of sworn testimony before Congress, the entire membership of the F. T. C. had formed an opinion, nevertheless the fact that the Commission entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed.

---

[1] Under the newly adopted Wisconsin Code of Civil Procedure, ch. 802.05, verified complaints are unnecessary. This evidences the doctrine that initial pleadings are not evidentiary in nature but are for the assertion of jurisdiction and to give notice of issues.

Thus, in a case recently approved in *Larkin,* the Supreme Court concluded that the mere forming of an opinion prior to the full-blown due-process hearing procedure did not irrevocably taint the tribunal. The court in *Larkin,* pages 48, 49, in citing *Federal Trade Commission,* said:

" 'No decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court.' "

It seems apparent, therefore, that the mere fact that Robertson had stated under oath, albeit in the instant case of a very formalistic nature, that there were grounds to remove DeLuca did not disqualify him from subsequently sitting as an impartial adjudicator. The presumption remains that Robertson, as a responsible state officeholder and entrusted with great public responsibility, would adhere to his oath and reach a final decision only on the basis of the evidence presented at the hearing. There is some evidence that he in fact did so and was not so "psychologically wedded" to his original charges as to be unable to admit error in the conclusions expressed in the charges, for a number of the charges which he brought were found by him to be either insubstantial, insufficient, or unsupported by the evidence. We do not, however, ratify his status by a hindsight view of his final vote. Rather, we conclude that he was not by his prior conduct disqualified as an impartial adjudicator.

It should again be emphasized that he was no mere volunteer. His action was a part of his ministerial func-

tion that was presumptively authorized by the entire council. In *Kachian v. Optometry Examining Board* (1969), 44 Wis. 2d 1, 13, 170 N. W. 2d 743, this court quoted with approval a passage from 97 A. L. R. 2d 1210, 1215:

" 'There is authority from several jurisdictions that disqualification for bias or interest will not result where the hearing body or its subordinates, acting within the scope of their proper ministerial functions, participated in the origination of charges against the licensee.' "

In a subsequent case, *LeBow v. Optometry Examining Board* (1971), 52 Wis. 2d 569, 191 N. W. 2d 47, we stated:

"Under the *Kachian* holding a member of the Board could have initiated the charges himself and could have made the investigation."

That statement in *LeBow* was dictum, but in view of the subsequent holding of *Larkin,* it is correct, subject to the special-circumstance limitations of *Larkin.*

We conclude that *LeBow* correctly stated that a member of a board may initiate the charges himself and could subsequently make an investigation and sit on the adjudicatory board unless there was evidence to show that the adjudicators were "so psychologically wedded to their complaints" that they could not, on the basis of the evidence, fairly decide the matter under consideration.

Nothing in this case leads us to conclude that Alderman Robertson was "psychologically wedded" to a preordained result. Certainly, the form of the verification is insufficient to overcome presumption of a state officer's honesty and integrity. There is nothing in the record to show that Robertson was the prosecutor of the case against DeLuca.

Although DeLuca was not required to show actual bias, he failed also to show special facts and circum-

stances to demonstrate that the risk of unfairness was intolerably high. DeLuca was not denied due process, and there was no evidence to show that his case was determined by a tribunal that was not impartial.

On appeal in this court, it was claimed for the first time that some of the aldermen should have been disqualified because they were involved in personal disputes with DeLuca. This objection was not timely raised and will not be dealt with.

It should also be pointed out that DeLuca claimed, for the first time in his petition for a writ of certiorari, that the two aldermen, Robertson and Daniel, had investigated the charges and they, therefore, were disqualified from further proceedings. These objections which were not made at the removal hearing cannot be made for the first time in the court proceedings on certiorari. We discuss the merits of the contention only because the issue is one of probable continuing public interest.

The separate investigation conducted by Aldermen Robertson and Daniel nevertheless raises a serious question, which, although not dispositive of the instant litigation, is of sufficient importance to be considered. DeLuca asserts, and it is not disputed, that at least three of the witnesses who appeared in support of charges against him had, on an earlier date, given tape-recorded statements to President Robertson. At the opening of the hearing before the council, DeLuca's attorney presented a motion requesting copies of any statements in possession of the council of witnesses who would be called to testify in support of the charges.

This motion was denied on the ground that it was not timely made. We agree, however, with the conclusion of the trial judge that the motion was timely, because it was not until just before the opening of the hearing that DeLuca and his counsel had any knowledge that these

statements had been taken. The ruling of President Robertson was erroneous.

The question presented here by the failure to produce the taped statements is twofold. The first is whether the council, by having in its possession prior statements of witnesses, relied on information which was not elicited at the public hearing. In addition, there is the question whether DeLuca was denied his right to cross-examine witnesses.

In criminal cases, the courts of the United States have required the production of prior statements made by prosecution witnesses for use by the defense in the course of cross-examination. *Jencks v. United States* (1957), 353 U. S. 657, 77 Sup. Ct. 1007, 1 L. Ed. 2d 1103. This court has adopted the rationale of *Jencks* in *State v. Richards* (1963), 21 Wis. 2d 622, 124 N. W. 2d 684.

The *Jencks* rationale has also been applied by courts in some civil or administrative cases. In *Harvey Aluminum (Incorporated) v. N. L. R. B.* (9th Cir. 1964), 335 Fed. 2d 749, the court applied the *Jencks* rationale to the National Labor Relations Board and held that prior statements by a witness must be produced by the Board under fundamental notions of fair play. Such statements need be produced only when a witness testifies and it appears that the statements are necessary for use in cross-examination and in impeachment. *National Labor Rel. Bd. v. Adhesive Products Corp.* (2d Cir. 1958), 258 Fed. 2d 403; *Fairbank v. Hardin* (9th Cir. 1970), 429 Fed. 2d 264; *Communist Party of U. S. v. Subversive Act. Con. Bd.* (D. C. Cir. 1958), 254 Fed. 2d 314.

In *Greco v. State Police Merit Board* (1969), 105 Ill. App. 2d 186, 245 N. E. 2d 99, the Illinois Appeals Court held that prehearing statements must be afforded to a party as a matter of due process. The court said:

"Since the Board uses an adversary procedure to perform its investigation, a fair and unbiased result can obtain only if both adversaries are allowed to present a full case and are allowed to rebut the opposition. Depriving the defense of pretrial statements of opposition witnesses who testify greatly impairs such full presentation and rebuttal and obliterates the opportunity for meaningful cross-examination. Without access to such statements, the defense is unable to test the memory, consistency, or veracity of the witnesses. In short, the best tool of cross-examination is denied the defense when pretrial written statements are withheld." (Pp. 191, 192)

In the instant case, the circumstance was aggravated, for it was the adjudicators themselves and not just the prosecutor who had possession of the tapes.

We conclude that the trial court in the instant case correctly held that the tapes should have been produced for the use of DeLuca and his counsel. The trial judge correctly said:

"The court is concerned by the failure of respondent to produce the tapes taken of three witnesses prior to the hearing after a demand was made by relator. They should have been listened to *in camera* and transcribed after privileged and irrelevant matters were spliced out. The court believes relator is correct that it deprived him of a valuable tool in cross-examination in testing the memory of the witnesses."

Even though the trial judge expressed his concern over the failure to produce the tapes, he stated that he could not reverse on this ground because DeLuca had failed to include the tapes as a part of the record. Accordingly, he could not determine whether DeLuca was prejudiced by the council's failure to produce the taped statements. The trial judge correctly emphasized that the case was before him on a writ of certiorari and he was therefore bound by the record. He correctly concluded that he could not, under the posture of the record

herein, determine whether the council had violated due process in denying the production of the tapes or that this denial prejudiced DeLuca to a material degree. The record showed a full, extensive, and apparently unhampered cross-examination of all the witnesses.

The trial court was correct in its holding. DeLuca had not only the burden of showing that the action complained of was erroneous, but also of showing that it was actually or probably prejudicial to a material degree. *State ex rel. Gregersen v. Board of Review* (1958), 5 Wis. 2d 28, 36, 92 N. W. 2d 236. Neither the trial court nor this court can presume prejudice even in the face of a record that shows error. *Viculin v. Dept. of Civil Service* (1971), 386 Mich. 375, 192 N. W. 2d 449.

On the basis of this record, we cannot hold that the common council of the city of Franklin exceeded its jurisdiction by denying DeLuca the tape-recorded statements of the witnesses who appeared in support of the charges against him.

Since we find no denial of due process, the question remains whether the evidence was sufficient to sustain the order of the common council. The standard on certiorari for the review of an administrative board's action is whether " 'the findings of the board upon the facts before it are conclusive if in any reasonable view the evidence sustains them.' " *State ex rel. B'nai B'rith Foundation v. Walworth County Board of Adjustment* (1973), 59 Wis. 2d 296, 303, 304, 208 N. W. 2d 113. The findings are conclusive if any reasonable view of the evidence sustains them and credibility is within the province of the administrative board. *State ex rel. Wasilewski v. Bd. School Directors* (1961), 14 Wis. 2d 243, 259, 111 N. W. 2d 198; *State ex rel. Ball v. McPhee, supra.*

The trial court carefully reviewed all of the evidence and modified several of the findings. After a complete

review of the evidence by this court, we conclude that the findings of the common council as amended by the circuit court are supported by substantial evidence. These findings constituted cause for discharge under the provisions of sec. 17.16, Stats. The council's order was neither arbitrary nor unreasonable.

*By the Court.*—Order affirmed.