NU-ROC NURSING HOME, INC., A Wisconsin Corporation,
Petitioner-Appellant,

v.

STATE OF WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL
SERVICES, Respondent-Respondent.

Court of Appeals

*No. 95–1644. Submitted on briefs January 8, 1996.—Decided
February 27, 1996.*

(Also reported in 546 N.W.2d 562.)

407

408

409

On behalf of petitioner-appellant, the cause was submitted on the briefs of *Robert M. Hesslink, Jr.* of *Hesslink Law Offices, S.C.* of Verona.

On behalf of respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Mary Woolsey Schlaefer*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Nu-Roc Nursing Home, Inc., a facility providing care for Medicaid patients, appeals an order affirming a Wisconsin Department of Health and Social Services (DHSS) decision denying state medical assistance reimbursement for payments Nu-Roc made to Millard Newton, the former co-owner and the father of the present Nu-Roc owners. The stated purpose of Nu-Roc's plan was to reimburse Millard for the extensive prior work, volunteer services and material goods donated for which the corporation could not afford to pay him during its early years of operation. DHSS denied reimbursement on grounds that the plan did not comply with regulations controlling compensa-

tion to related parties. Nu-Roc contends that DHSS misconstrued the controlling regulation found in the controlling federal Medicare guidelines.

Alternatively, Nu-Roc seeks a remand for a new hearing on grounds it was denied procedural fairness in several respects, including: (1) a decision from a biased hearing examiner; (2) a denial of adequate time to object to the examiner's decision; (3) the participation of an agency employee as both advocate and decision maker; and (4) totality of the circumstances. Because we conclude that the evidence fails to show the challenged activities were sufficiently unfair so as to require a new proceeding, we reject the remand request. We also disagree with Nu-Roc's contention that the agency misconstrued the relevant reimbursement regulations, and we therefore affirm the DHSS decision on the merits.

## BACKGROUND

Millard and Betty Newton established Nu-Roc in 1953, and operated the facility until their retirement on July 1, 1983, when they sold the company to their two sons.[1] At all times relevant, Nu-Roc was a corporation licensed by the state as a nursing home and skilled nursing facility, and certified as a Medicaid provider by the federal government. In 1977, the board of directors discussed the possibility of a pension for both Millard and Betty that would pay them for many years of prior service for which they had not been compensated. The only evidence of this earlier discussion discloses no specific plan, and the board "left it open" because money

---

[1] Millard and Betty gifted several shares of stock to their sons in the year preceding the sale. The sale, however, occurred on July 1, 1983.

was not available to fund a pension. The matter may have been discussed at future meetings as well, but no decision was reached.

In November 1982, less than a year from the date the senior Newtons retired and sold the company to their children, Nu-Roc's board of directors (Millard, Betty, and their two sons) approved a written "Executive Compensation Plan" for Millard: The board voted to pay Millard $10,000 a year for twenty years commencing upon his retirement.[2] Consideration for the

---

[2] Paul Max Newton's testimony confirms the fact that the payment was for past services.

> Back in 1977, the Board of Directors discussed the possibility of a pension program for Millard and Betty Newton. At that time, it was tabled because we had talked it over and the money wasn't available at that time to be able to fund any type of pension program. But, we left it open for review at future meetings, and I think it was brought up again in 1980 at a Board meeting, and in '82, and at that point in time it was determined that there was monies available, or would be monies available in the future to be able to fund a pension program for Millard and Betty Newton *for past years' services that they were uncompensated for*—many hours, and what not—
>
> . . . .
>
> Yeah, they—the nursing home was started in 1953. Okay—I went back and found the records, W-2s and what not, of wages that were paid and that, and for the first year and three months, they never even drew any wages out of the nursing home when it was starting out. I went back and dug through all that stuff and, as far as hours and what not, nobody here would know the number of hours that my father put in and my mother, at the nursing home, as far as Saturdays and Sundays. I can remember when I was a small child, every Sunday after church we would go out (sic) the nursing home as a family. And my dad was there every Sunday, every Saturday. If there was a call in the middle of the night, he ran out to the nursing home. If the fire alarm went off, he went down to the fire station and checked to see if the fire was at the nursing home. It's a different type of situation than a lot of people might perceive here. (Emphasis added.)

payment to Millard was his prior years of service to the corporation.[3]

The Medicaid program, Title XIX of the Social Security Act, provides reimbursement by the federal government of a portion of the payments made by participating states to hospitals and nursing homes providing care and services to elderly and indigent medical patients. As a condition to reimbursement, states are required to establish reimbursement mechanisms that provide rates that are reasonable and necessary to meet the costs incurred consistent with applicable state and federal laws and regulations, including quality and safety standards. The State of Wisconsin elected to participate in Medicaid and provided a reimbursement plan approved by the United States Department of Health and Human Services. DHSS oversees the reimbursement of medical assistance providers such as nursing homes. Pursuant to § 49.45(6m), STATS., 1985-86, DHSS is required to file the system it uses to determine which expenses are properly reimbursable, and the joint finance committee must approve the system. For the years covering the

---

[3] The written "Executive Compensation Plan" provided "Deferred Compensation Benefits":

> In consideration for the many years of service . . . the Employee [h]as given to the corporation including the many uncompensated hours of evening and weekend work as well as the personal contributions of not only energies of the Employee's family that were not compensated for but also the material goods that the Employee has, during the lien (sic) years of this corporation, contributed voluntarily to the corporation this Board shall, in recognition of all of these many years and all of these many attributes, provide deferred compensation as follows: . . . .

Millard's son provided testimony explaining the reasons for the plan. The relevant portion of his testimony is set forth later in this decision.

disputed payments to Millard, DHSS had filed and obtained approval of the *Methods of Implementation* of *The Nursing Home Payment Methods (Methods)* as its reimbursement system.

A DHSS auditor rejected reimbursement for Nu-Roc's payments under the executive compensation plan for fiscal years 1985-86, 1986-87 and 1987-88. In explaining the disallowances, the auditor testified that he relied on the *Standard Testing Model for Related Party Compensation ( Model)* as a means of interpreting *Methods. Model* was written and used by DHSS to assist in implementing *Methods.*

Nu-Roc requested a hearing on the disallowances, claiming that the auditor improperly relied on the *Model* because it was not filed by DHSS and approved by the Joint Finance Committee. The hearing was held before hearing examiner Joseph Nowick on February 6, 1991. Nowick failed to issue an opinion for two years after the hearing. Nu-Roc filed suit requesting that the circuit court conduct a hearing on the merits of the audit disallowances. Nu-Roc claimed it had exhausted its administrative remedies because DHSS had not yet issued an opinion.[4]

When Nowick's supervisor learned of the suit seeking a new hearing in the circuit court, he wrote a memo directing Nowick to decide the case promptly because of the impending lawsuit. Shortly thereafter, Nowick issued a proposed decision in which he concluded that the executive compensation payments were not reimbursable medical assistance costs. Nowick reasoned that Millard did not perform any services in the cost years in question, so his compensation was not allowa-

---

[4] The circuit court dismissed the 1993 action seeking a new hearing in the trial court as moot when DHSS issued its final decision.

ble under the *Methods*. The proposed decision stated that its conclusion was justified under both the plain language of the *Methods* and by using the *Model* as an interpretive source. DHSS summarily adopted Nowick's proposed decision as its final decision.

Nu-Roc appealed DHSS' decision to the circuit court. The circuit court rejected Nu-Roc's challenges to the fairness of the procedure, holding that Nu-Roc did not establish that it was prejudiced by the irregularities in procedure. Next, the circuit court affirmed DHSS' decision on the merits, holding that services have to be performed during the fiscal year in question in order to be considered for reimbursement.

## FAIRNESS OF THE PROCEDURE

The due process clause requires that an adjudicator in an administrative hearing be fair and impartial. *State ex rel. DeLuca v. Common Council*, 72 Wis. 2d 672, 684, 242 N.W.2d 689, 696 (1976).[5] There is a presumption of honesty and integrity in those serving as adjudicators in state administrative proceedings. *Id.* An administrative decision can violate due process either by bias in fact on the part of the decision maker

---

[5] Wisconsin has adopted § 227.57(4), STATS., to insure that the procedure before the administrative agency meets the due process requirements. *Bracegirdle v. Board of Nursing*, 159 Wis. 2d 402, 416, 464 N.W.2d 111, 115-16 (Ct. App. 1990). That subsection provides: "The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure." In *Bracegirdle*, we held this subsection does not require a higher standard of fairness than the constitutional due process standard. *Id.*

415

or when the risk of bias is impermissibly high. *Guthrie v. WERC*, 111 Wis. 2d 447, 454, 331 N.W.2d 331, 335 (1983). In *Guthrie*, our supreme court identified two situations where the risk of bias violates due process even if bias in fact is not proved: "Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Id.* at 455, 331 N.W.2d at 335 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (footnotes omitted)).

### 1. Claim that Nowick was Biased

Nowick's supervisor informed Nowick by memorandum that Nu-Roc had filed a lawsuit against DHSS because of Nowick's delay in writing the preliminary decision. Nowick testified that he knew his supervisor was displeased because his delay led to the lawsuit. Nu-Roc concludes that the lawsuit created the appearance of bias because the lawsuit was a "personal attack" as contemplated in *Guthrie*.

We reject Nu-Roc's argument. "Personal abuse or criticism" creates a constitutionally impermissible appearance of bias only when the adjudicator and a litigant have become embroiled in a running controversy in which the litigant has slandered the adjudicator in such a manner that makes it unlikely the adjudicator can maintain a calm detachment. *See, e.g., Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971). For instance, in *Mayberry*, the party called the judge a hatchet man, a stumbling dog, a fool and threatened to blow the judge's head off. *Id.* at 456, 458, 466.

416

Criticism of an adjudicator's performance of his official duties does not spur the type of animosity created by the personal insults and threats in *Mayberry*. "We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Ungar v. Sarafite*, 376 U.S. 575, 584 (1964). The additional fact that Nu-Roc commenced an action in circuit court seeking a resolution of the underlying dispute on the merits is also insufficient to create a constitutionally impermissible appearance of bias.

### 2. Response Time to the Proposed Decision

Subsection 227.46(2), STATS., provides parties an opportunity to file objections to a proposed decision, but does not specify how long adversely affected parties have to file objections.[6] The director of DHSS testified that DHSS normally gives fifteen days for adversely

---

[6] Subsection 227.46(2), STATS., provides:

[I]n any contested case which is a class 2 or class 3 proceeding, where a majority of the officials of the agency who are to render the final decision are not present for the hearing, the hearing examiner presiding at the hearing shall prepare a proposed decision, including findings of fact, conclusions of law, order and opinion, in a form that may be adopted as the final decision in the case. The proposed decision shall be a part of the record and shall be served by the agency on all parties. Each party adversely affected by the proposed decision shall be given an opportunity to file objections to the proposed decision, briefly stating the reasons and authorities for each objection, and to argue with respect to them before the officials who are to participate in the decision. The agency may direct whether such argument shall be written or oral. If an agency's decision varies in any respect from the decision of the hearing examiner, the agency's decision shall include an explanation of the basis for each variance.

affected parties to respond, but in this case the period of time was shortened to ten days so that there would be a decision in place prior to the due date for the answer in Nu-Roc's lawsuit against DHSS. Nu-Roc argues that the "manipulation" of the due date to file objections is inappropriate and gives evidence of bias.

We disagree. Nu-Roc fails to establish that "either the fairness of the proceedings or the correctness of the action" was impaired by shortening the reply date so as to warrant remand under § 227.57(4), STATS. Further, it fails to suggest how its reply would have been different had it been given the additional time.

### 3. Dual Role of John Brown

John Brown participated in the final decision reached by DHSS. Brown is the deputy to counsel who represented DHSS at the administrative hearing. Nu-Roc argues that Brown's participation in the decision making process constituted ex parte communications from legal counsel's office to the decision maker in violation of § 227.50(1)(a), STATS.

Section 227.50(1), STATS., provides in part:

(1)(a) In a contested case, no ex parte communication relative to the merits . . . shall be made, before a decision is rendered, to the hearing examiner or any other official or employe of the agency who is involved in the decision-making process, by:

1. An official of the agency or any other public employe or official engaged in prosecution or advocacy in connection with the matter under consideration or a factually related matter; or

2. A party to the proceeding, or any person who directly or indirectly would have a substantial

interest in the proposed agency action or an authorized representative or counsel.

(b)   Paragraph (a) 1. does not apply to an advisory staff which does not participate in the proceeding.

We conclude that Brown's participation in the decision is governed by subdiv. (1)(a)1. However, his advisory role is exempted by paragraph (1)(b) because Nu-Roc presented no evidence that Brown participated as an advocate in the proceeding.

■

Nu-Roc argues that Brown's actions in this case are prohibited by subdiv. (1)(a)2 on the grounds that he has an indirect substantial interest in the agency action in light of his supervisor's service as counsel for one of the parties. We disagree. Subsection (1) governs communications from agency officials. If being an official of the agency involved in the prosecution or the prosecution of a factually related matter was enough to constitute "substantial interest" for purposes of subsec. (2), then subsec. (1) would be superfluous. We avoid interpretations of statutes that make them superfluous. *State v. Eichman*, 155 Wis. 2d 552, 560, 456 N.W.2d 143, 146 (1990).

Alternatively, Nu-Roc argues that common law principles forbid participation in the decision making process by a representative of legal counsel's office. *Guthrie* adopts a per se rule that an administrative decision maker is disqualified if the decision maker has previously acted as counsel. *Id.* at 461, 331 N.W.2d at 338. The *Guthrie* court reasoned in those circumstances the risk of unfairness is intolerably great as a matter of law. *Id.*

In *Bracegirdle*, 159 Wis. 2d at 414, 464 N.W.2d at 115, we decided that *Guthrie*'s rule did not apply when

the chairperson of an administrative board advised the prosecuting attorney in preparing the charges and also participated in the board's decision to reprimand Bracegirdle. We distinguished *Guthrie* on the grounds that the chairperson acted only as an advisor to the prosecuting attorney. *Bracegirdle*, 159 Wis. 2d at 414, 464 N.W.2d at 115. Following *Bracegirdle*, we conclude that *Guthrie*'s per se rule does not apply. Brown is not acting counsel for DHSS; he is merely the subordinate of the acting counsel. Further, Brown is not the decision maker in this case, he is merely the advisor to the decision maker.

■

When the *Guthrie* rule is inapplicable, we decide whether the decision maker's participation creates an intolerable risk of unfairness. *Bracegirdle*, 159 Wis. 2d at 415, 464 N.W.2d. at 115. In *DeLuca*, our supreme court held that a plaintiff must show "special facts and circumstances to demonstrate that the risk of unfairness is intolerably high." *Id.* at 691-92, 242 N.W.2d at 699. This strong showing is necessary to rebut the presumption of a state officer's honesty and integrity. *Bracegirdle*, 159 Wis. 2d at 415, 464 N.W.2d at 115. *Withrow* held that a plaintiff could meet this burden by showing that the investigator/adjudicator had become "psychologically wedded" to a predetermined disposition of the case. *Id.* at 57.

■

Nu-Roc fails to show special facts and circumstances to demonstrate that the risk of unfairness was "intolerably high." There is no evidence Brown made prosecutorial decisions on the merits of this case so as to become psychologically wedded to the prosecutor's position. We conclude that Brown's professional relationship with counsel for DHSS, standing alone, does

not constitute a "strong showing" necessary to overcome the presumption of honesty and integrity afforded a state official. *See Bracegirdle*, 159 Wis. 2d at 415, 464 N.W.2d at 115.

### 4. The Totality of the Circumstances

Nu-Roc argues that even if no single impropriety justifies a new hearing, we should remand the case because the totality of the circumstances indicates that the hearing was not fair, citing *Marris v. City of Cedarburg*, 176 Wis. 2d 14, 498 N.W.2d 842 (1993). In *Marris*, the chairperson of the decision making board referred to the plaintiff's legal position as a loophole in need of closing and suggested to other board members that they should "try to get [the plaintiff] under the Leona Helmsley rule." *Id.* at 27, 498 N.W.2d at 848. The chairperson refused to recuse himself and participated in the decision. *Id. Marris* held that these statements showed prejudgment to an extent that overcame the presumption of honesty and integrity afforded a state official. *Id.* at 29-30, 498 N.W.2d at 849. There is no evidence that DHSS decision makers prejudged this case in a manner similar to the chairperson in *Marris*. Consequently, we reject Nu-Roc's argument.

### WHETHER THE PAYMENTS ARE REIMBURSABLE

Subsection 49.45(6m), Stats., 1985-86, the statute applicable to the proceedings, required DHSS to file with the legislature a prospective reimbursement system annually to determine which nursing home costs are allowable for purposes of medical assistance reim-

bursement. Under the statute, the legislature's joint committee on finance must approve the reimbursement system. For the years in question, DHSS filed the *Methods* as its reimbursement system. DHSS decided the payments were not reimbursable under the *Methods* based on the plain language of the *Methods* and using the *Model* as an interpretive source of the *Methods*. The circuit court affirmed the decision of DHSS, holding that services have to be performed during the fiscal year in question in order to be considered for reimbursement.

## 1. Standard of Review

We review DHSS's decision, not the decision of the circuit court. *Richland County v. DHSS*, 183 Wis. 2d 61, 64, 515 N.W.2d 272, 274 (Ct. App. 1994). The primary issue in our case is interpretation of administrative regulations to determine which year the costs of the executive compensation plan should be allocated in calculating the nursing home's medical assistance reimbursement rate. Interpretation of statutes, administrative regulations and federal guidelines are questions of law we review de novo. *Id.* at 66, 515 N.W.2d at 275. However, we apply one of three levels of deference to an agency's conclusion of law. *Sauk County v. WERC*, 165 Wis. 2d 406, 413-14, 477 N.W.2d 267, 270 (1991). The highest amount of deference given to an agency's decision is great weight. We use the great weight standard when the agency's experience and specialized knowledge aid it in interpreting the law, when the agency's interpretation and application of the law is of long standing, or when a legal question is intertwined with factual, value or policy determina-

tions. *Id.* at 413, 477 N.W.2d at 270. We apply "due weight" to determinations of very nearly first impression, and no weight to determinations of first impression. *Id.* at 413-14, 477 N.W.2d at 270-71.

DHSS argues that when an agency adopts its own regulations, in this case DHSS' adoption of the *Methods*, we give deference to its interpretation if it "has developed, through the rule-making process, a degree of experience and expertise . . . ." *Richland School Dist. v. DILHR*, 174 Wis. 2d 878, 891-92, 498 N.W.2d 826, 831 (1993). The specific provisions of the *Methods* does not address our issue. Rather, the *Methods* incorporates Medicare guidelines to address the issue. DHSS did not develop expertise in interpreting these Medicare guidelines merely by incorporating them by reference. Further, the facts in this case are undisputed, so our analysis is not intertwined with factual determinations. Because this is a matter of first impression, we will not give DHSS' decision deference.

### 2. The Right to Reimbursement Under the Regulations

Nu-Roc acknowledges that this is a related party transaction for purposes of the *Methods*. DHSS decided that the deferred compensation to Millard, paid not as in inducement to him to provide current services, but as a reward for services provided in the past, is not "reasonable and necessary" compensation as required by the provision governing compensation to a related party, *Methods* § 1.256.[7] DHSS held that this regula-

---

[7] Section 1.256 of the *Methods* provides in relevant part:

Total compensation included in the payment rate for owners and family relation, in any form, must be reasonable and necessary.

tion renders the compensation unreasonable and unnecessary. It decided that under the circumstances, it exceeded compensation "for similar services of other nursing homes or the home in question."[8] The purpose of this principle "is to avoid the payment of a profit factor to the nursing home through the related organization, and also to avoid payment of artificially inflated expenses which may be generated from less than 'arms length' bargaining." *Methods* § 1.250.

Nu-Roc contends that neither *Methods* § 1.256 nor the *Model* is dispositive because they do not purport to regulate a deferred compensation plan. Rather, Nu-Roc contends, a deferred compensation plan is reviewed in light of the federal Medicare guidelines incorporated by reference by § 1.255 *Methods*.[9] Nu-Roc argues that under Medicare standards, payments to related parties in executive compensation plans are reimbursable if the parties reach an oral agreement before the employee earns the deferred income. We need not address the abstract issue whether an oral agreement

---

· Reasonable compensation should not exceed what would be paid for similar services by other nursing homes or the home in question. "Necessary" means that the services are required and commonly performed in other nursing homes and that, if the services were not performed by the owner or related individual, another person would have to be employed or contracted to perform them.

[8] The plan in question contains a separate provision for Millard's compensation, payable monthly in return for services commencing on December 1, 1982, separate from the deferred compensation benefits provision of $10,000 payable annually upon retirement. This compensation is not at issue.

· [9] Section 1.255 of the *Methods* provides: "Generally, the Department will adhere to the Medicare Program's guidelines and interpretations when examining payment issues arising out of costs to related organizations."

to pay deferred compensation that is later reduced to writing is enforceable under the Medicare guidelines. The issue is not presented because, even were the fact finder to construe the evidence to show that the 1982 agreement was a confirmation of an earlier oral agreement, that agreement in this case fails to comply with the definition of a valid deferred compensation plan under the Medicare guidelines.

The federal *Provider Reimbursement Manual* (*PRM*), promulgated by the United States Secretary of Health and Human Services, defines deferred compensation as "direct remuneration *currently earned* by an employee but which is not received until a subsequent period . . . . " *PRM* § 2140.1, MEDICARE & MEDICAID GUIDE (CCH) ¶ 5998 (emphasis added). The payments to Millard were simply not "currently earned"; rather, the sums represent at best reimbursement for services and goods previously provided. The written plan compensates only for services and goods that Millard "has . . . contributed." Paul Max Newton's testimony confirms Nu-Roc's intent to pay Millard for the early years of service for which Nu-Roc lacked funds to pay him. There is no evidence that the payments were compensation for present and future services.

In summary, any procedural irregularities were not sufficiently unfair so as to require a new hearing. Because Millard's pay plan failed to meet the definition of a valid deferred compensation plan, DHSS was authorized to deny reimbursement to Nu-Roc from government funds.

*By the Court.*—Order affirmed.