Dean PATTERSON, Petitioner-Appellant,

v.

BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant-Respondent-Petitioner.

Supreme Court

*No. 82–1942. Argued April 23, 1984.—Decided June 27, 1984.*

(Also reported in 350 N.W.2d 612.)

For the defendant-respondent-petitioner the cause was argued by *LeRoy L. Dalton,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the petitioner-appellant there was a brief by *John S. Williamson, Jr.*, and *Habush, Habush & Davis, S.C.*, Milwaukee, and oral argument by *Mr. Williamson.*

Amicus curiae brief was filed by *Bruce Meredith*, Madison, staff counsel for Wisconsin Education Association Council.

LOUIS J. CECI, J.   This is a review of a decision of the court of appeals[1] that reversed the judgment of the circuit court for Barron county, Honorable James C. Eaton, Circuit Judge. The circuit court had affirmed the decisions of the Board of Regents of the University of Wisconsin System and the University of Wisconsin Center System Appeals and Grievance Committee that the committee had no jurisdiction over a dispute concerning whether the respondent voluntarily resigned or was discharged from his position as a tenured instructor. Chancellor Edward Fort had previously determined that the respondent, Dean Patterson, had voluntarily resigned from his faculty position. Because we conclude that the respondent was denied his due process rights as a tenured instructor, we sustain the holding of the court of appeals.

The record indicates that Patterson was a tenured geography instructor in the University of Wisconsin Center System. He taught courses in history, geography, and anthropology at the Barron county campus. By 1977, declining enrollments in the courses taught by Patterson made it difficult for fulltime teaching assignments to be made to him. In December of 1977, Patterson was notified by Dean Meggers that a steering committee would be appointed to investigate and evaluate his work, due to a number of faculty and student complaints. Shortly thereafter, Patterson requested and was granted sick

[1] *Patterson v. University Board of Regents*, 114 Wis. 2d 495, 339 N.W.2d 130 (Ct. App. 1983).

leave for the coming semester because of various physical ailments.

Upon Patterson's return in the fall of 1978, virtually no students had enrolled in the two geography classes he was assigned to teach. The dean recommended that both classes be cancelled.

Subsequently, there was some discussion with Patterson concerning his fall assignment. On September 23, 1978, the executive committee of the department of geography and geology met in a closed session to review Patterson's job performance, pursuant to Associate Chancellor Daniel VanEyck's request. Patterson was notified of the meeting and attended part of the session. After considering the written materials submitted to the committee and Patterson's own presentation, the committee found his professional job performance to be less than satisfactory.

On November 29, 1978, Patterson met with the dean concerning his fall assignment. The assignment which the dean gave Patterson consisted of a major study of former students' profiles and demographic information to be used by the campus in its public relations work with the Barron county board and in work with area high school counselors. Patterson agreed that the assignment was a challenging and worthwhile one but refused to accept it until all allegations and all of the complaints that had been registered with the chancellor were dropped. The responsibilities of the student profile project were put in writing by the dean and sent to Patterson on November 30, 1978.

It appears that Patterson did not report for his assigned work on the student profile project and was contacted on December 14, 1978, and January 18, 1979, by Associate Chancellor VanEyck concerning his unexcused absences from work. The January 18 letter stated that unless Patterson reported for his assigned duties by 8:30

a.m. on January 23, 1979, his absence would be treated as a resignation from the university as of that date. Patterson responded on January 19 as follows:

"I am willing and available to teach classes, but I refuse to accept other duties until fully cleared of all charges, and only after these other duties are approved by the Geography Department."

On January 23, Patterson did report to the dean to discuss his assignment; however, he did not work on the student profile project. By letter, he stated that it was impossible for him to work on the Barron county campus while the charges against him remained unresolved. He requested that the chancellor deal immediately with any pending charges and dismiss those that were without substance. Meanwhile, he offered to take an unpaid leave of absence while these proceedings took place. He also stated that if the chancellor wished to eliminate his teaching position because of "a lack of need for it," he would resign if all other matters were dismissed and he was compensated for the remaining contractual period.

Chancellor Fort notified Patterson by letter on February 5, 1979, that because of his failure to report for work as previously assigned by 8:30 a.m. on January 23, 1979, his absence was treated as a resignation from his position at the university as of January 23, 1979.

By letter dated February 6, 1979, Patterson stated that he had *not* resigned and requested that the procedures set forth in UWS ch. 4, Wis. Admin. Code (1975),[2] relating to just cause, due notice, and hearing be followed concerning his "discharge." Chancellor Fort responded by letter, restating his position that Patterson had resigned. However, he asked Patterson to attend a meeting on March 8, 1979, in order to allow Patterson to refute Fort's conclusion that he had resigned. Patterson at-

---

[2] The 1975 provisions of the Wisconsin Administrative Code cited in this opinion are applicable to the instant case.

tended the meeting, along with Associate Chancellor VanEyck, Dean Meggers, and Dr. Eugene Hartmann, but Chancellor Fort did not. A tape recording was made of the meeting, which Fort later reviewed. He concluded that Patterson's absence from his assigned duties constituted a constructive resignation.

Patterson subsequently applied for unemployment compensation benefits for the week ending January 27, 1979. The Wisconsin Department of Industry, Labor and Human Relations (DILHR) determined that Patterson's actions had been inconsistent with a continuing employment relationship with the university and had amounted to a "quit" and that he was, therefore, ineligible for the payment of unemployment compensation benefits.

In July of 1979, Patterson's attorney requested that the Appeal and Grievance Committee of the University Center System conduct a hearing on whether Patterson's termination resulted from a resignation or a discharge and, if a discharge, whether the grounds were adequate. The committee met and considered the question of whether it had jurisdiction to consider the dispute. The committee concluded that there were,

". . . insufficient grounds to permit us to conclude that your dispute with the Center System is a 'dismissal for cause' as defined by UWS Chapter 4 and the Center System Constitution, Article 7.04."

The committee also found that the issues raised were not those of a "grievance" or "complaint" as described in UWS ch. 6, nor an "appeal" as defined in UWS sec. 3.08, nor a dispute which would be covered by the regulations of UWS ch. 4. Therefore, the committee concluded that it had no jurisdiction in the dispute.

Thereafter, Patterson appealed the decision of the appeals and grievance committee to the board of regents. On June 9, 1980, the regents adopted a resolution sustaining the decision of the appeals and grievance committee, stating that "the record establishes that Mr. Patterson

was not discharged from his position as a tenured Instructor at the UW Center-Barron County campus of the University of Wisconsin Center System." The petition for judicial review was filed in circuit court on July 8, 1980.

In a memorandum decision, the circuit court affirmed the board of regents, holding that due process had been afforded in the form of the reviews by the grievance committee, the board, and the court, together with the "clear and unequivocal instructions given by the University" to Patterson concerning his unexcused absences. Patterson subsequently appealed to the court of appeals.

In *Patterson v. University Board of Regents,* 114 Wis. 2d 495, the court of appeals reversed the circuit court judgment and remanded the cause to the board, with directions to hold a hearing before an impartial decision maker on the question of whether Patterson quit or was discharged.

The court noted that Patterson had not sought review of the circuit court's conclusion that he had quit. The court instead observed that Patterson had argued that he was entitled to a hearing before an impartial tribunal to determine the nature of his termination and that his right to procedural due process was violated because of the denial of such a hearing.

The court of appeals first stated that once the dispute arose concerning whether Patterson quit or was discharged, Patterson was entitled to due process because of the potential deprivation of his property interest, namely, his interest in his employment as created and defined by sec. 36.13, Stats. *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). The court then stated that at a minimum, a hearing was required, pursuant to the provisions of UWS sec. 4.01, Wis. Admin. Code, to resolve this dispute. The court concluded that Patterson was denied due process in this case because the decision maker, Chancellor Fort,

presented a "risk of bias in that procedure." *Patterson v. University Board of Regents,* 114 Wis. 2d at 502. The court held that Patterson should have had a hearing before a decision maker other than the party who initially handled and was directly involved in the dispute. *Withrow v. Larkin,* 421 U.S. 35, 47 (1975). The court further concluded that the subsequent procedures of the appeals and grievance committee and the board of regents were insufficient to afford due process, because they essentially amounted to a refusal to review.

We are faced, then, with two issues in this review. They are: (1) Was due process required to determine the nature of Patterson's termination and, if so, did Patterson receive due process; and (2) to what extent do the statutory unemployment compensation procedures before DILHR to determine whether there was a resignation or discharge satisfy any due process requirement that exists?

## I.

## WAS DUE PROCESS REQUIRED TO DETERMINE THE NATURE OF PATTERSON'S TERMINATION AND, IF SO, DID PATTERSON RECEIVE DUE PROCESS?

This review concerns the board of regents' determination that it had no jurisdiction over the dispute between Patterson and Chancellor Fort and that the record established that Patterson was not discharged from his position as a tenured instructor at the UW Center-Barron county campus. Under sec. 36.09, Stats., concerning the university system, "the primary responsibility for governance of the system" is vested in the board of regents. Therefore, the board functions as the administrative agency in the university system.

We note that the original dispute began in December of 1977, when Patterson was notified of the steering committee's investigation and evaluation of his work. Therefore, sec. 227.20, Stats. 1975, applies to this review of the board's action. Because Patterson alleges that he was not afforded a proper hearing by the university's handling of this matter, the relevant section pertaining to this review is sec. 227.20 (4), which states,

"The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure."

This court has recognized that the appellate court's scope of review of an administrative board's action is identical to that of the circuit court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d 396, 405, 291 N.W.2d 850 (1980), and *Scharping v. Johnson,* 32 Wis. 2d 383, 145 N.W.2d 691 (1966).

Patterson has taken the position that he was deprived of due process because he was not given a hearing on the issue of whether his termination was due to a discharge or resignation. He argues that the meeting which took place on March 8, 1979, among Dr. Hartmann, Associate Chancellor VanEyck, Dean Meggers, and Patterson was virtually meaningless, since Chancellor Fort had already made a decision to treat Patterson's actions as a resignation. Patterson maintains that if Chancellor Fort's decision is allowed to stand, the university can circumvent the safeguards of sec. 36.13 (5), Stats., by treating every termination of a tenured faculty member as a resignation.

The board, on the other hand, argues that Patterson was afforded sufficient due process through repeated warnings from the chancellor that his continued absences would be treated as a resignation and the subsequent meeting with Chancellor Fort's subordinates.

Initially, we note that sec. 36.13, Stats., entitled "Faculty tenure and probationary appointments," provides in part,

"(1) DEFINITIONS. In this section:
"(a) "Tenure appointment" means an appointment for an unlimited period granted to a ranked faculty member by the board upon the affirmative recommendation of the appropriate chancellor and academic department or its functional equivalent within an institution.
". . .
"(5) PROCEDURAL GUARANTEES. Any person having tenure may be dismissed only for just cause and only after due notice and hearing. Any person having a probationary appointment may be dismissed prior to the end of the person's contract term only for just cause and only after due notice and hearing. The action and decision of the board in such matters shall be final, subject to judicial review under ch. 227. The board and its several faculties shall develop procedures for the notice and hearing which shall be adopted by rule under ch. 227."

The relevant portions of UWS ch. 4, Wis. Admin. Code, read as follows:

"UWS 4.01 Dismissal for cause. (1) Any faculty member having tenure may be dismissed only by the board and only for just cause and only after due notice and hearing. . . .
"UWS 4.05 Adequate due process. (1) A fair hearing for a faculty member whose dismissal is sought under section UWS 4.01 shall include the following:
"(a) Service of written notice of hearing on the specific charges at least 10 days prior to the hearing;
"(b) A right to the names of witnesses and of access to documentary evidence upon the basis of which dismissal is sought;
"(c) A right to be heard in his/her defense;
"(d) A right to counsel and/or other representatives, and to offer witnesses;
"(e) A right to confront and cross-examine adverse witnesses;
"(f) A verbatim record of all hearings, which might be a sound recording, provided at no cost;

"(g) Written findings of fact and decision based on the hearing record;

"(h) Admissibility of evidence governed by 227.10, Wis. Stats."

We also note that in *State ex rel. DeLuca v. Common Council*, 72 Wis. 2d 672, 677, 242 N.W.2d 689 (1976), this court stated that due process is a requirement only where state action is involved. In the instant case, it is clear that the university is a creature of the state, as set forth in secs. 36.01(1) and 36.03, Stats.[3]

The United States Supreme Court has recognized that " ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The *Mathews* decision set forth three factors to be considered when identifying the specific dictates of due process in a given situation.

---

[3] Sections 36.01(1) and 36.03, Stats., provide as follows:

"**36.01 Statement of purpose and mission.** (1) The legislature finds it in the public interest to provide a system of higher education which enables students of all ages, backgrounds and levels of income to participate in the search for knowledge and individual development; which stresses undergraduate teaching as its main priority; which offers selected professional graduate and research programs with emphasis on state and national needs; which fosters diversity of educational opportunity; which promotes service to the public; which makes effective and efficient use of human and physical resources; which functions cooperatively with other educational institutions and systems; and which promotes internal coordination and the wisest possible use of resources."

"**36.03 System.** There is created in this state a system of institutions of learning to be known as the university of Wisconsin system. The principal office and one university of the system shall be located at or near the seat of state government."

They are: (1) The private interest that will be affected by the state action; (2) the risk of an erroneous deprivation of the private interest through the procedures utilized and the probable value of added or substitute procedural safeguards; and (3) the state's interest, which includes the function involved and the fiscal and administrative burdens that the added or substitute procedural requirements would impose. *Mathews v. Eldridge,* 424 U.S. at 334–35. Therefore, we begin our analysis with a consideration of the private interest which would be affected by the action in this case.

From the face of sec. 36.13(1)(a), Stats., it is clear that because Patterson had received a "tenure appointment," he had a statutory entitlement to his position which could only be taken from him for cause. This court recognized in the decision of *State ex rel. DeLuca v. Common Council,* 72 Wis. 2d at 678, that when an individual's property interest is one conferred by the law of the state, it is protected by the due process provisions of both the Wisconsin and federal constitutions. *See also, Goss v. Lopez,* 419 U.S. 565, 573 (1975); *Board of Regents v. Roth,* 408 U.S. at 576–77; *Perry v. Sindermann,* 408 U.S. 593 (1972); and *Johnson v. Board of Regents of University of Wis. Sys.,* 377 F. Supp. 227 (W.D. Wis. 1974). Consequently, we find that Patterson's employment status as a tenured professor constituted a property right and must be afforded due process safeguards before he can be deprived of this status.

Next, we must consider the risk of an erroneous deprivation of the private interest, which may have resulted from the procedures utilized in this case by the university through Chancellor Fort's actions, and the probable value of additional or substitute procedural safeguards. When we review the record in the instant case, we find that the associate chancellor notified Patterson twice by letter

that unless he reported for work on January 23, 1979, his unexcused absences would be treated as a resignation. We also find that Patterson responded by letter twice, stating in the first letter that he refused to accept any duties besides teaching until all charges against him had been cleared and the alternate duties approved by the geography department and, in the second letter, that he could not work on the Barron county campus while the charges against him remained unresolved. Patterson's second letter also indicated that he was willing to take an unpaid leave of absence while the necessary proceedings took place. He also met with the dean to discuss his assignment and how he thought the project might be accomplished. Subsequently, Chancellor Fort notified Patterson that he (Patterson) had constructively resigned.

We find the risk of an erroneous deprivation which may have resulted from the procedure utilized by the university to have been inordinately high. Clearly, there was some conflict between Patterson and the university concerning his treatment by the university, as was evidenced by his letters to the chancellor. Patterson evidently felt that he was unable to carry out the duties assigned to him while this conflict remained unresolved, and he therefore refused to perform his assigned duties. Whether or not he was justified in reacting in this manner, and ultimately whether or not his actions amounted to a constructive resignation, is not before us. However, we agree with the court of appeals that once the dispute arose as to whether Patterson's actions constituted a resignation, it should have been resolved through an evidentiary hearing affording procedural safeguards and not through a series of letters between Patterson and Chancellor Fort, which ultimately led to Fort's determination that Patterson had resigned. This is because if Patterson was justified in refusing to perform his duties until his dispute with the university was resolved, Chan-

cellor Fort's initial characterization of Patterson's termination as a resignation could have effectively deprived Patterson of a protected property interest without his having been afforded due process. Therefore, we find that this situation is one which mandates the due process requirements of an evidentiary hearing in order to avoid the high risk of an erroneous deprivation.

The *Mathews* decision pointed out that when considering the risk of an erroneous deprivation of a property interest which may have resulted from the procedures utilized, the fairness and reliability of the existing pretermination procedures should be considered because "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ." *Mathews v. Eldridge,* 424 U.S. at 343–44. We note that the Supreme Court in the decision of *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970), stated that "written submissions are a wholly unsatisfactory basis for decision."[4]

"[W]ritten submissions do not afford the flexibility of oral presentations; they do not permit the [person being deprived of a property interest] to mold his argument to

[4] The *Mathews* case held that physicians' reports, upon which the state agency of the social security administration based its decision that a disabled worker no longer qualified for disability benefits, were a satisfactory procedural safeguard surrounding the termination of benefits. This is because the Court found that such reports are "'routine, standard, and unbiased . . . .'" *Mathews v. Eldridge,* 424 U.S. at 344 (citation omitted). The *Mathews* decision also noted that, "Such sources are likely to be able to communicate more effectively through written documents than are welfare recipients or the lay witnesses supporting their cause. The conclusions of physicians often are supported by X-rays and the results of clinical or laboratory tests, information typically more amenable to written than to oral presentation." *Id.* at 345. This case did not involve the use of routine or unbiased reports by Fort to make his determination that Patterson had resigned. Rather, it involved a conflict between Patterson and the university as to what Patterson's conduct should be. Therefore, we find that this language of *Mathews* does not apply in the instant case.

the issues the decision maker appears to regard as important." *Id.*

Similarly, we find the use of letters by Chancellor Fort to be totally unsatisfactory as a means of assuring fairness of the procedures. Chancellor Fort's use of Patterson's letters did not "afford the flexibility of oral presentations," and it did not allow Patterson the opportunity "to mold his argument to the issues" which Fort may have considered important and upon which he chose to base his decision. *Id.* Rather, it merely allowed Patterson to state his position that he did not intend to resign, but instead protested the university's treatment of him.

The *Goldberg* decision also observed that secondhand presentations to the decision maker are unsatisfactory, since presentation of the side of the person being affected by the termination is left to the party reporting to the decision maker. *Id.* For this reason, we find that the meeting on March 8, 1979, at which Patterson presented his side of the controversy without the presence of Chancellor Fort, was lacking in reliability and fairness. It was also lacking by virtue of the fact that Fort had made the determination that Patterson had resigned prior to the March 8 meeting.

Consequently, we find the potential value behind the additional safeguards in the form of an evidentiary hearing to be great. The additional safeguards already exist in UWS sec. 6.02, Wis. Admin. Code, which deals with grievances and provides for a hearing in order to resolve such grievances or recommend solutions to the board.[5] As the *Mathews* decision stated,

---

[5] UWS sec. 6.02, Wis. Admin. Code, provides as follows: *"UWS 6.02 Grievances.* The faculty of each institution shall designate a committee or other appropriate faculty body to hear faculty grievances under rules and procedures established by the faculty of the institution in conjunction with the chancellor; such committee or faculty body shall have the power to conduct hearings

"This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. at 333.

The Supreme Court has also held that due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). A UWS sec. 6.02 grievance hearing would provide the party disputing the form of a termination with a meaningful opportunity to be heard, before the decision to deny him or her a tenured job is made. Further, the party hearing the dispute would then be able to make a factual determination as to the nature of the termination. If the termination is found to be a discharge, then sec. 36.13(5), Stats., and UWS sec. 4.01, Wis. Admin. Code, mandate a finding that it was for cause.

Finally, we must consider the state's interest in providing a hearing, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would impose. *Mathews v. Eldridge*, 424 U.S. at 335. To begin with, we note that UWS sec. 6.02 already provides a system whereby grievances on the part of a faculty member may be heard. Therefore, we find no particularly heavy fiscal or administrative burden would be imposed by requiring the additional hearing.

The *Mathews* Court characterized this final factor when considering the specific dictates of due process as one involving public interest. *Id.* at 347. We find that treating this dispute as a grievance for hearing purposes is consistent with the policy behind ch. 36, Stats., ad-

and fact-finding related to the grievance, and the authority to recommend solutions to such grievances to the chancellor, and to the board should the matter not be resolved at the institutional level."

dressing the University of Wisconsin System, as set forth in sec. 36.01(2) :

"The mission of the system is to develop human resources, to discover and disseminate knowledge, to extend knowledge and its application beyond the boundaries of its campuses and to serve and stimulate society by developing in students heightened intellectual, cultural and humane sensitivities, scientific, professional and technological expertise and a sense of purpose. Inherent in this broad mission are methods of instruction, research, extended training and public service designed to educate people and improve the human condition. Basic to every purpose of the system is the search for truth."

The language of sec. 36.13, regarding tenured professors, has been set forth above. Section 36.13(5) contains procedural protections surrounding the dismissal of a tenured faculty member, providing that a "person having tenure may be dismissed only for just cause and only after due notice and hearing." UWS sec. 4.05, Wis. Admin. Code, provides the procedures to be followed for such a dismissal.

The obvious purpose behind sec. 36.13 is that tenured professors may only be dismissed for cause, in order to assure that faculty members are guaranteed freedom as teachers in order that the goals set forth by the legislature in sec. 36.01(2) are achieved. As Professor Emerson has stated,

"The chief device for assuring the faculty member freedom as a teacher, scholar and citizen is his right to tenure. . . . The institution of tenure is designed to guard the faculty member against dismissal for political or other inadmissible reasons, a fact often hard for him to prove, and to assure him economic security in which he can carry on his search for truth in his teaching and research. Other protective devices are embodied in the concept of 'academic due process.' The principles of aca-

demic due process, still in the stage of growth, entitle the faculty member to certain procedural rights in dismissal or disciplinary proceedings, including a determination of the issues, at least in the first instance, by a tribunal of his peers." T. Emerson, *The System of Freedom of Expression* 594–95 (1970).

Accordingly, we find that providing a tenured faculty member with an evidentiary hearing prior to termination when the member alleges that the termination is actually a discharge promotes the policies behind ch. 36, Stats. Providing such an evidentiary hearing is also consistent with the purposes behind the legislature's establishment of a tenure system. This also protects the public from the ultimate loss of qualified, talented faculty members whose actions may have been erroneously considered to have constituted resignation.

We believe this situation is similar to that set out in *Watkins v. Milwaukee County Civil Service Comm.*, 88 Wis. 2d 411, 276 N.W.2d 775 (1979), where this court treated resignation by coercion as a discharge and ordered the Milwaukee county civil service commission to conduct a hearing in order to determine whether the petitioner's resignation had been coerced. The court noted that,

"Treating coerced resignations as discharges for purposes of hearings under sec. 63.10, Stats., fits well with the policies of security of tenure and impartial evaluation which underlie the civil service system." *Id.* at 420.

The same rationale applies in the instant case, although we do not go so far as to treat this dispute as a discharge. Rather, allowing an evidentiary hearing and fact findings concerning the nature of the faculty member's termination promotes the public interest.

## II.

TO WHAT EXTENT DO THE STATUTORY UNEM-
PLOYMENT COMPENSATION PROCEDURES BE-
FORE DILHR TO DETERMINE WHETHER THERE
WAS A RESIGNATION OR DISCHARGE SATISFY
ANY DUE PROCESS REQUIREMENT THAT EX-
ISTS?

As we noted above, Patterson applied for unemploy-
ment compensation benefits for the week ending January
27, 1979. DILHR determined that his actions were in-
consistent with a continuing employment relationship
and constituted a quit. Therefore, DILHR denied him
unemployment compensation benefits.

The board of regents has taken the position that
DILHR's determination fully complies with due process
requirements because a hearing was available under sec.
108.09(2r), Stats., before an appeal tribunal, as well as
commission review under sec. 108.09(6) and judicial re-
view pursuant to sec. 108.09(7). Patterson did not re-
quest such a review.

The record indicates that DILHR made the following
initial determination:

"After his scheduled courses for the fall semester were
cancelled, the claimant was instructed to work in an ad-
ministrative assignment. He would not have lost his title
or tenure with the employer. Due to outlying factors, the
claimant refused. He was given written notice that if he
did not report for work in the above week, he was consid-
ered to have resigned. Still the claimant refused to report
for work.

"The claimant's actions were inconsistent with a con-
tinuing employment relationship and constituted a quit.

"The claimant terminated his employment with the em-
ployer. It is not established that he did so within any of
the exceptions to Section 108.04(7), which would allow
the payment of benefits at this time."

We observe that DILHR does not have general jurisdiction. Rather, under sec. 108.09, Stats., entitled "Settlement of benefit claims," the department's authority is as follows:

"(2) COMPUTATION AND DETERMINATION.

" . . .

"(b) A department deputy shall issue determinations whenever necessary to resolve any matters which may bar, suspend, terminate or otherwise affect the employe's eligibility for benefits."

Similarly, under sec. 108.04(7),[6] the general rule is that if DILHR determines that an employee voluntarily terminates his employment, he or she is ineligible for unemployment compensation. *See, Nottelson v. ILHR Department,* 94 Wis. 2d 106, 118, 287 N.W.2d 763 (1980). Voluntary termination may be found from a refusal to perform validly assigned duties. *Peters v. Personnel Board,* 254 Wis. 227, 35 N.W.2d 924 (1949). This is consistent with the general purpose behind the unemployment compensation statute.

"In brief, the purpose of this statute is to stabilize employment and to minimize the loss of income when an employee involuntarily is out of work through the fault or misfortune of his employer. The statute was not enacted to provide relief in lieu of wages when *reasonable work is available which the employee can but will not do.*" *Roberts v. Industrial Comm.,* 2 Wis. 2d 399, 402–03, 86 N.W. 2d 406 (1957). (Emphasis added.)

---

[6] Section 108.04(7), Stats., entitled, "Voluntary termination of employment," provides in part: "(a) If an employe terminates his or her employment with an employing unit, the employe shall be ineligible for any benefits for the week of termination and thereafter until he or she has again been employed within at least 4 weeks and has earned wages of at least $200, except as otherwise provided in this subsection." The remaining part of the statute provides exceptions to this general rule which are not relevant to our determination of this case.

However, the purpose behind ch. 36, Stats., and, more particularly, behind sec. 36.13 concerning tenure is entirely different from the purposes behind the unemployment compensation statute. We have stated that the policy behind sec. 36.13 is to assure faculty members are guaranteed freedom as instructors in order to achieve the goals as set forth by the legislature in sec. 36.01(2). Therefore, a tenured professor's refusal to accept "reasonable work" because of his dispute with the university's treatment of him may or may not constitute a voluntary termination. "The conclusive effect of an administrative determination is limited to the purpose for which it was made." *Conn. Light & Power Co. v. Federal Power Com'n,* 557 F.2d 349 (2d Cir. 1977). Because the policies behind the two chapters are distinct and the actual issues resolved by the board and DILHR are separate and distinct, the presence of sufficient due process safeguards in one proceeding does not cure the lack of them in another. Accordingly, we find that the procedures before DILHR do not satisfy due process requirements which were lacking in the board's actions.

*By the Court.*—The decision of the court of appeals is affirmed; the judgment of the circuit court is reversed; and the cause is remanded to the board of regents for further proceedings consistent with this opinion.

ABRAHAMSON, J., took no part.