286 Wis.2d 252 (2005)
2005 WI 159
706 N.W.2d 110
John MARDER, Plaintiff-Appellant-Cross-Respondent-Petitioner,[]
v.
BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant-Respondent-Cross-Appellant.
No. 2003AP2755.
Supreme Court of Wisconsin.
Oral argument September 27, 2005.
Decided November 29, 2005.
For the plaintiff-appellant-cross-respondent-petitioner there were briefs by Aaron N. Halstead and Shneidman, Hawks & Ehlke, S.C., Madison, and oral argument by Aaron N. Halstead.
*256 For the defendant-respondent-cross-appellant the cause was argued by Jennifer Sloan Lattis, assistant attorney general, with whom on the brief was Peggy A. Lautenschlager, attorney general.
*255 ¶ 1. PATIENCE DRAKE ROGGENSACK, J.
This is the review of a decision from the court of appeals reversing the order of the circuit court for Douglas County, Robert E. Eaton, Judge, that reversed the decision of the Board of Regents of the University of Wisconsin System (Board) to terminate John Marder, a tenured faculty member at the University of Wisconsin-Superior (UW-Superior).
¶ 2. Marder does not assert that there was insufficient evidence presented to the Board to terminate him for just cause. Instead, he argues that: (1) the Board failed to accord him a fair hearing under the contested case procedures of ch. 227, which prohibits ex parte communications with the decision-maker on the merits of the case and provides specific remedies when such communication occurs; and (2) the Board was a biased decision-maker, thereby denying him due process of law, because of three alleged ex parte communications: (a) between the chancellor of UW-Superior and Regent Toby Marcovich; (b) between counsel advising the chancellor and counsel advising the Board; and (c) between the chancellor and the Board just before the Board voted to terminate him.
¶ 3. We conclude that the proper pre-termination procedure for a tenured faculty member of the University of Wisconsin System is set out in Wis. Stat. § 36.13(5) (2003-04)[1] and Wis. Admin. Code § UWS 4 *257 (Apr., 2001),[2] which the Board correctly employed, and that there has been no showing that Marder's rights were compromised by alleged ex parte communications between the chancellor and Regent Marcovich or between the University of Wisconsin System counsel who advised the chancellor and the Board. However, based on the record before us, we cannot determine whether in the communication between the chancellor and the Board, which occurred immediately before the Board voted to terminate Marder, the chancellor presented new facts to the Board upon which its decision to terminate Marder was based. Therefore, we remand to the circuit court for the limited purpose of making that determination. We leave to the circuit court's discretion the decision of whether discovery is needed to determine whether the chancellor presented any new facts upon which Marder's termination was based. Accordingly, we affirm the decision of the court of appeals.

I. BACKGROUND
¶ 4. Marder was first employed by the UW-Superior in 1987; he was a tenured professor in the Department of Communicating Arts. In 1999, UW-Superior Chancellor Julius Erlenbach served Marder with a Statement of Charges that included 18 separate charges against him that the chancellor said "evince a pattern of behavior that is inconsistent with the expectations this university has of tenured faculty members and which further violate standards of professional conduct, thus constituting just cause to dismiss you from your tenured faculty position at UW-Superior." *258 The chancellor advised Marder that he had the right to request a hearing on the chancellor's decision to terminate his employment.
¶ 5. The Statement of Charges that led to the chancellor's decision to dismiss Marder included the following: (1) Marder shared a hotel room with a particular female UW-Superior student and drank too much alcohol which caused him to "black-out" so that he was unable to remember if he had engaged in sexual misconduct; (2) Marder shared hotel rooms and traveled with a different female UW-Superior student, who complained to the Affirmative Action Committee that Marder engaged in inappropriate sexual conduct, causing the Committee to find that he had engaged in improper behavior with the student; (3) Marder manipulated student evaluations by playing a tape recording relating to his removal as advisor to the student newspaper for his editing class during the final five or six minutes of class in the middle of the semester, and then distributed course evaluations, for the students to complete, even though evaluations were not to be done until the end of the semester; (4) Marder continued to complain because one of his colleagues had married a departmental secretary, causing considerable conflict with her and requiring corrective action by the Provost; (5) Marder repeatedly engaged in harassing and disruptive behavior toward his faculty colleagues and departmental staff, which became so unpleasant that the Provost moved Marder's office out of the Communicating Arts building and adjusted his workload; (6) Marder was the custodian of the accounts for the student newspaper when various irregularities in its accounts occurred; (7) Marder sent a letter to the Wisconsin Attorney General containing misrepresentations of fact about his departmental chair; and (8) Marder sent a *259 letter to the UW-Superior auditor that contained confidential and inaccurate information about a colleague, in an effort to draw the auditor into an intra-departmental conflict.
¶ 6. Marder requested a hearing on his termination, pursuant to Wis. Admin. Code § UWS 4.04.[3] In January of 2000, pursuant to § UWS 4.03,[4] a Committee of Faculty Terminations (CFT), comprised of four tenured faculty members at UW-Superior, held two days of hearings and rejected the chancellor's recommendation to terminate Marder. However, the CFT found that there had been "a near total breakdown in collegiality in the Department of Communicating Arts," and that Marder "engaged in a course of conduct that is simply unacceptable on this or any other university campus." The committee did not recommend that Marder be dismissed, but did recommend that he be transferred to another department and that he be forced to undergo professional counseling.
¶ 7. During the CFT hearing, attorneys from the Office of the General Counsel of the University of Wisconsin System (General Counsel's Office), including Patricia Brady (Brady) and Anne Bilder (Bilder), served as legal counsel to the chancellor. They were under the *260 supervision of Attorney Elizabeth Rindskopf Parker, who was at the same time acting as legal counsel to the Board.
¶ 8. After the CFT issued its decision, the chancellor persisted in his intention to terminate Marder, and pursuant to Wis. Admin. Code § UWS 4.07(1),[5] he recommended to Katherine Lyall, President of the University of Wisconsin System, that Marder be dismissed. In that recommendation, the chancellor reported that Marder had been the subject of a number of formal and informal complaints by students, faculty, staff and the chair of his department at UW-Superior, involving matters of alleged sexual misconduct with students, alleged inappropriate conduct as an instructor and troubled relationships with fellow faculty members. In the same recommendation, the chancellor also noted that, in accordance with § UWS 4.07(1), he had reviewed the record of the CFT hearing and the CFT *261 report rejecting his recommendation to terminate Marder, that the CFT's report contained errors of law and fact, that the CFT's recommendations were unrealistic[6] and that Marder should be dismissed.
¶ 9. The chancellor explained that the record of the hearing disclosed serious instances of misconduct, and that after hearing these facts, he could not accept the CFT's conclusion that termination should not occur. He asserted that Marder's dismissal was necessary to maintain faculty morale and the integrity of the University, and he requested that President Lyall forward his recommendation to the Board for further consideration.
¶ 10. President Lyall referred the chancellor's request to the Personnel Matters Review Committee (PMRC) of the Board for review. Attorneys Brady and Bilder continued to provide counsel to the chancellor during the proceedings before the PMRC.
¶ 11. On March 8, 2001, the PMRC recommended to the Board that the dismissal proceedings against Marder be discontinued, but that Marder be placed on notice that his past behavior could be used against him if he were involved in a subsequent disciplinary proceeding. The Board did not accept this recommendation and returned the matter to the PMRC for hearing.
¶ 12. The PMRC held a hearing at which it invited argument from Marder and the chancellor. It again recommended that Marder not be terminated, but it failed to include within its recommendation *262 proposed findings of fact and conclusions of law. Therefore, the Board returned the case to the PMRC for preparations of proposed findings and conclusions.
¶ 13. On June 8, 2001, the Board held a meeting in Milwaukee at which Marder's termination was discussed. The chancellor flew from Superior to Milwaukee for that meeting with Regent Marcovich. At the meeting, the chancellor addressed the Board in closed session about his decision to terminate Marder. Attorneys from the General Counsel's Office, including those who advised the chancellor and those who advised the Board, were present. Marder and his attorney were not allowed to be present. Directly following the closed session, the Board voted 11 to 3 in open session to accept the chancellor's recommendation to terminate Marder.
¶ 14. The Finding of Fact, Conclusions of Law and Order of the Board from the termination proceedings included the following:
(2) A female UW-Superior student accused Professor Marder of inappropriate conduct during a school-related trip to New York City in March 1995. He admitted sharing a hotel room with the student, and admitted that he had consumed so much alcohol that he experienced a "black out" and could not recall whether or not he had, as she alleged, masturbated in front of her....
(4) Professor Marder pursued a personal relationship with a foreign (French) student commencing in 1994 while she was seeking advice on possible admission and later studying at UW-Superior. ... The foreign student filed a formal complaint of sexual harassment against Professor Marder ... which included allegations that he masturbated in front of her in shared hotel rooms....

*263 (8) In late December 1996, shortly after Professor Marder was made custodian of the [student newspaper's] financial accounts, UW-Superior conducted an audit of those accounts. Professor Marder provided information ... to the campus auditor ... [that] included confidential matters related to Professor Marder's treatment of the department secretary ... and inaccurate information about [another professor's] activities in connection with the [newspaper] .... Marder indicated in his transmittal of the confidential information to [the auditor] that he had provided students with copies of the information....
(12) Professor Marder sent a letter dated February 5, 1997, to the Attorney General complaining of an open meetings law violation which gives the impression that [another professor] or [the department administrative assistant] had influenced [the auditor's] decision not to permit tape recording of a meeting. The letter seeks to have the Attorney General bring charges for an open meetings violation against [the auditor, another professor and the department administrative assistant]. The accusation against [the other professor and the department administrative assistant] was untrue and the letter's recounting of the events was misleading ....
(20) After Professor Marder concluded that [the department administrative assistant] had befriended the French student with whom [Marder] was pursuing a personal relationship, he responded by making a series of unfounded accusations against [the department administrative assistant].
(25) There was no evidence introduced to establish that anyone other than Professor Marder had contributed to the breakdown of collegiality within his department.
....

*264 (2) There is just cause for the dismissal of John Marder from his tenured faculty position at the UW-Superior under the applicable standard for such matters....
¶ 15. Marder petitioned the Douglas County Circuit Court for review of his termination pursuant to Wis. Stat. § 227.53(1). He sought reversal of the Board's decision, or, in the alternative, leave to take discovery regarding three alleged ex parte communications that he argued violated his due process right to an unbiased decision-maker. The circuit court reviewed the case and concluded that the prohibition of ex parte communications for contested cases set forth in Wis. Stat. § 227.50 required that Marder be present when the Board and the chancellor met. It declined to grant discovery or to reverse the Board's decision based on Marder's contention that the Board was too biased to hear the case. Instead, it remanded the case to the Board for further action on "a correct interpretation of the law."
¶ 16. Marder appealed the decision, arguing that the Board was too tainted to render a fair decision in a remand of the matter. Alternatively, Marder disputed the circuit court's denial of his request to allow discovery. The Board cross-appealed the circuit court's determination that contested case provisions of ch. 227 applied to Marder's case.
¶ 17. The court of appeals concluded that ch. 227 contested case provisions did not apply to Marder's case. However, it held that the applicable administrative code provisions, § UWS 4, and Marder's constitutional due process rights required Marder's presence at any hearing in which new facts were presented on which his discharge was based. The court of appeals remanded the matter to the circuit court to determine whether such facts were presented when the chancellor *265 met with the Board immediately before the Board voted to terminate Marder. Marder petitioned for review, which we granted.

II. DISCUSSION

A. Standard of Review
¶ 18. This case requires us to interpret related statutes, to review an agency's application of its own rules and to determine whether the agency's pre-termination procedures accorded Marder due process of law.
¶ 19. Statutory interpretation and the application of a statute to a given set of facts are questions of law that we review independently, but benefiting from the analyses of the court of appeals and the circuit court. State v. Cole, 2003 WI 59, ¶ 12, 262 Wis. 2d 167, 663 N.W.2d 700. An administrative agency's interpretation of its own rules is controlling unless plainly erroneous or inconsistent with the language of the rule. State v. Busch, 217 Wis. 2d 429, 441, 576 N.W.2d 904 (1998). We review whether due process has been provided as a question of law. State v. Sorenson, 2002 WI 78, ¶ 25, 254 Wis. 2d 54, 646 N.W.2d 354.

B. Wisconsin Statutes
¶ 20. Marder contends that the court of appeals erred because he was entitled to the procedures applicable to contested cases under the criteria set out in *266 Wis. Stat. § 227.42(1).[7] The Board disagrees, and contends that the legislature created Wis. Stat. § 36.13,[8] which gave the Board authority to create attendant administrative rules to serve as the specific procedure the University is to follow when considering the termination of a tenured faculty member. The Board explains that according to § 36.13(5) it promulgated Wis. Admin. Code § UWS 4 to accord notice and hearing prior to termination, which it applied here.
¶ 21. To interpret whether the contested case provisions of ch. 227 apply, we begin by examining the plain meaning of the statutory language, in context, as is required by State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 *267 N.W.2d 110. "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole ... and reasonably, to avoid absurd or unreasonable results." Id. Here, we must interpret several statutes that it is argued may relate to pre-termination procedures for a tenured faculty member. We do so to avoid inconsistencies. See City of Milwaukee v. Milwaukee County, 27 Wis. 2d 53, 56, 133 N.W.2d 393 (1965). The context in which we interpret Wis. Stat. § 227.42 includes Wis. Stat. § 36.13(5) because § 36.13(5) addresses termination of tenured faculty members.
¶ 22. It is not disputed that Wis. Stat. § 36.13(5) requires the Board to develop procedures for notice and hearing to employ when it is recommended that a tenured faculty member be dismissed. Additionally, Marder does not dispute that Wis. Admin. Code § UWS 4 was promulgated in accord with § 36.13(5). Rather, it is his position that the general contested case provisions of ch. 227 must be applied to the procedures set out in § UWS 4, even though Wis. Stat. § 227.42 does not specify the agency actions to which it applies. The Board asserts that if the legislature had intended the contested case provisions of ch. 227 to apply, there would have been no need for § 36.13(5).
¶ 23. We agree with the Board. We note that generally where a specific statutory provision leads in one direction and a general statutory provision in another, the specific statutory provision controls. See State v. Smith, 106 Wis. 2d 151, 159, 316 N.W.2d 124 (Ct. App. 1982). Here, the Board has promulgated through its rule-making power a complete procedure to be employed before a tenured faculty member can be terminated. In addition, in Wis. Stat. § 227.42(3) the *268 legislature explained that there would be occasions when it would choose to create notice and hearing procedures for particular agency actions and when it did so, the provisions of § 227.42 would not apply. Section 227.42(3) provides:
This section does not apply to rule-making proceedings or rehearings, or to actions where hearings at the discretion of the agency are expressly authorized by law.
¶ 24. In Waste Management of Wisconsin, Inc. v. DNR, 149 Wis. 2d 817, 440 N.W.2d 337 (1989), we interpreted the relationship between the contested case provisions of ch. 227 and Wis. Stat. § 227.42(3). We concluded that the legislative history behind § 227.42 showed it was intended to fill gaps where hearing rights were needed, but had not been provided in a specific statute. Id. at 828. We also concluded that subsection (3) excluded "from the scope of the provision actions for which hearing rights are provided elsewhere." Id. The reasoning of Waste Management is applicable here because there is no gap in the statutes or administrative code regarding the hearing rights afforded to tenured faculty undergoing pre-termination procedures. Accordingly, we conclude that the provisions of § 36.13(5) and the rules the Board promulgated under Wis. Admin. Code § UWS 4, which are expressly authorized by law, set out the pre-termination procedures to which Marder was due.[9] The contested case provisions of ch. *269 227 do not apply. This includes Wis. Stat. § 227.50(1), which comes into play only if the contested case provisions of § 227.42(1) apply.

C. Administrative Rules
¶ 25. Wisconsin Admin. Code § UWS 4, Procedures for Dismissal, provides a standard, "just cause," that must be met before a tenured faculty member can be dismissed. § UWS 4.01. It also provides the right to notice and hearing on the charges against the faculty member, § UWS 4.02-4.05, with ultimate review of whether termination should occur resting with the Board, § UWS 4.08. Nothing in § UWS 4 explicitly prohibits ex parte communications as Wis. Stat. § 227.50(1) does in a contested case proceeding. However, because Marder has a due process right to notice and an opportunity to be heard on the charges against him, Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985), a consultation outside of Marder's presence may cause constitutional problems if during the consultation the chancellor provided the Board with new facts on which the Board based Marder's termination, even if such consultation does not conflict with the terms of the administrative rule. See id. at 545-46.

D. Ex Parte Communications
¶ 26. Marder contends that three ex parte communications violated his statutory rights and the due process guaranty to an unbiased decision-maker. The contacts are: (1) between the chancellor of UW-Superior and Regent Marcovich; (2) between counsel advising the chancellor and counsel advising the Board; and (3) between the chancellor and the Board just before the Board voted to terminate Marder. We have *270 already addressed Marder's statutory argument; we now proceed to address his due process concerns.
¶ 27. We begin by noting that it is uncontested that Marder has a due process right in his continued employment at UW-Superior. See Loudermill, 470 U.S. at 538; Patterson v. Bd. of Regents, 119 Wis. 2d 570, 581, 350 N.W.2d 612 (1984). A basic element of constitutional due process, to which Marder is entitled, is a fair hearing conducted before a fair tribunal. See In re Murchison, 349 U.S. 133, 136 (1955). "It is ... undisputable that a minimal rudiment of due process is a fair and impartial decisionmaker." Guthrie v. WERC, 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983). The United States Supreme Court and Wisconsin courts have held that an adjudicator in an administrative hearing comes within the ambit of the due process requirement of an unbiased decision-maker. See Withrow v. Larkin, 421 U.S. 35, 46 (1975); see also State ex rel. DeLuca v. Common Council, 72 Wis. 2d 672, 684, 242 N.W.2d 689 (1976). Furthermore, violations of due process are not limited to bias or unfairness in fact, but in very limited circumstances may occur "when the risk of bias is impermissibly high." Guthrie, 111 Wis. 2d at 454 (concluding that the risk of bias is impermissibly high when one who acted as counsel for one of the parties becomes the decision-maker).
¶ 28. If the risk of bias does not fall within one of the few circumstances where the risk of bias is impermissibly high, an ex parte communication merits further consideration as a potential violation of due process rights only if the decision-maker is provided new and material information in the course of the communication. *271 Stone v. FDIC, 179 F.3d 1368, 1376 (Fed. Cir. 1999). As was carefully explained in Stone:
The introduction of new and material information by means of ex parte communications to the deciding official undermines the public employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond .... However, not every ex parte communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles the claimant to an entirely new administrative proceeding. Only ex parte communications that introduce new and material information to the deciding official will violate the due process guarantee of notice.
Id. at 1376-77.
¶ 29. In explaining when the risk of actual bias is impermissibly high, Withrow held that administrative adjudicators retain a presumption of honesty and integrity and that, absent "a showing to the contrary, state administrators `are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" Withrow, 421 U.S. at 55 (citing United States v. Morgan, 313 U.S. 409, 421 (1941)). In Withrow, the Supreme Court rejected the idea that because an adjudicating body had participated in the initiation and investigation of the administrative charges to suspend a physician's license, the physician's right to a fair and impartial decision-maker had been violated. See Withrow, 421 U.S. at 57.
¶ 30. In concluding that there had been no showing of a biased decision-maker, the Supreme Court contrasted the circumstances of that case with cases "in which the adjudicator [had] a pecuniary interest in the *272 outcome [or] in which he has been the target of abuse or criticism from the party before him." Id. at 47 (citations omitted). The court reasoned that mere exposure to the evidence presented in non-adversary investigative procedures was insufficient to impugn the fairness of the board members who later sat as adjudicators in an adversary hearing. Id. at 57. The court based that conclusion on the reasoning that under those circumstances the risk of bias or prejudice was not "intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." Id. Finally, in Withrow the Supreme Court placed the burden of making such a showing on the party challenging the impartiality of the adjudicator. Id. at 47.
¶ 31. In DeLuca, we interpreted and applied Withrow in order to ascertain that in a city council dismissal hearing, the initiation of removal proceedings by aldermen who subsequently decided the matter as adjudicators did not necessarily create circumstances that violated any constitutional right to a fair and impartial adjudicator. DeLuca, 72 Wis. 2d at 684. We relied on the Withrow presumption that administrative adjudicators act with honesty and integrity, and imposed the burden established in that case: "even where the investigative and adjudicative functions are combined, the objector must assume the heavy burden of showing that this combination of functions creates an unconstitutional risk of unfairness." Id.
¶ 32. Wisconsin appellate courts have applied this rule in cases of administrative adjudication in which professional relationships and dual roles linked adversary counsel and adjudicators and required a strong *273 showing to rebut the presumption that administrative agents act with integrity. See Nu-Roc Nursing Home, Inc. v. DHSS, 200 Wis. 2d 405, 416, 546 N.W.2d 562 (Ct. App. 1996) (concluding that "[c]riticism of an adjudicator's performance of his official duties does not spur the type of animosity created by personal insults and threats"); see also Bracegirdle v. Dep't of Regulation & Licensing, 159 Wis. 2d 402, 464 N.W.2d 111 (Ct. App. 1990) (concluding that Bracegirdle's right to an impartial decision-maker was not contravened when the chairman of the board advised the attorney who prepared the charges against Bracegirdle). Those cases apply the high Withrow burden to challenges to an agency's adjudication based on an alleged lack of impartiality in violation of due process.
¶ 33. Accordingly, we must determine whether Marder has carried the burden to show that the three alleged ex parte communications created an impermissibly high probability of actual bias or introduced new information on which the Board based its decision to terminate Marder. The first improper communication is alleged to have occurred during the plane ride to the Board's June 8, 2001 meeting, between the chancellor and Regent Marcovich. Marder does not allege that the plane ride created an impermissibly high probability of actual bias. Instead, it is his theory that the time that the chancellor and Regent Marcovich spent together on the plane was suspicious because it occurred on the same day as the Board voted to terminate him and it was Marcovich who moved for Marder's termination. He speculates that the chancellor and Marcovich must have discussed the case in an inappropriate way.
¶ 34. However, Marder has not presented any facts that would overcome the presumption that the *274 chancellor and Marcovich acted appropriately when they traveled together. They were not prohibited from talking to one another and the legal presumption that administrative adjudicators are able to maintain their professional and ethical responsibility to remain impartial and to conduct themselves appropriately applies to Marcovich. Marder's general complaints do not meet the high burden set forth in Withrow and adopted by us in DeLuca.
¶ 35. The second contact Marder challenges occurred between attorneys in the General Counsel's Office, one of whom advised the chancellor and the other of whom advised the Board during Marder's dismissal proceedings. Marder argues that these circumstances created partiality in the Board and that there may have been inappropriate strategizing between the attorneys that tainted his right to a fair hearing before an impartial adjudicator. Marder argues that the principles set forth by this court in Guthrie, in which an administrative decision-maker was disqualified because he had previously acted as counsel for one of the parties in the same matter, should apply to his case.
¶ 36. We disagree. In Guthrie, we held that an administrative decision-maker is disqualified when he or she has previously acted as counsel for one of the parties because "the possibility of partiality or bias is too high to be constitutionally tolerable." Guthrie, 111 Wis. 2d at 460. Here, none of the attorneys in a previous proceeding involving Marder sat on the Board as a decision-maker. Rather, they provided counsel for a University of Wisconsin employee, the chancellor, and a University of Wisconsin board, the Board of Regents.
*275 ¶ 37. We conclude that the facts of this case more closely parallel Bracegirdle, in which the court of appeals concluded that there was not an intolerable risk of unfairness when the chairperson of a board advised the prosecuting attorney and also prepared the board's decision. See Bracegirdle, 159 Wis. 2d at 414-15; see also Nu-Roc, 200 Wis. 2d at 420-21, in which the court of appeals applied the reasoning of Bracegirdle. In Nu-Roc, a deputy to adversary counsel representing the agency in an adjudicated administrative matter participated in the final decision of the case. The court of appeals held that the deputy's professional relationship with counsel did not overcome the presumption of honesty and integrity of the decision-makers.
¶ 38. Here, Marder's argument regarding the shared office of counsel does not overcome the high burden we have established to overcome the presumption that the Board acted with honesty and integrity. Further, he did not argue that the risk of unfairness was intolerably high under the circumstances. He simply alleged that because the chancellor and the Board received legal consultation from attorneys who work for the same office, there was a possibility that the attorneys strategized inappropriately. He did not show that through this indirect relationship the adjudicator had become "psychologically wedded" to a predetermined disposition in the case.
¶ 39. The final communication that Marder alleges violated his rights is the Board's consultation with the chancellor during the closed meeting immediately prior to the Board's vote to terminate him. The Board concluded that it was required to consult with the chancellor under Wis. Admin. Code § UWS 4.08(2), which states:

*276 If, after the hearing, the board decides to take action different from the recommendation of the faculty hearing committee and/or the chancellor, then before taking final action the board shall consult with the faculty hearing committee and/or the chancellor, as appropriate.
Because the chancellor continued to recommend dismissal when both the PMRC and the CFT had not, the Board relied on § UWS 4.08(2) for its procedure. Section UWS 4.08(2) does not require that this consultation occur in the presence of the faculty member; and as an initial matter, the Board's interpretation of its own rules is controlling unless that interpretation is inconsistent with the language of the rule. Hillhaven Corp. v. DHFS, 2000 WI App 20, 232 Wis. 2d 400, 606 N.W.2d 572. There is nothing about this consultation that creates an impermissible risk of actual bias, nor does Marder allege that there was. However, even though we know the Board and the chancellor consulted about whether to terminate Marder, we do not have enough information about what occurred in that meeting to determine if Marder's rights were violated by the presentation of new facts on which his termination was based.
¶ 40. Therefore, as the United States Supreme Court has explained, because due process requires that deprivation of property must be preceded by notice and an opportunity for hearing appropriate to the nature of the case, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950), Marder's right to notice of the charges against him was violated if the Board was presented with new facts on which Marder's termination was based. Therefore, we agree with the court of appeals that a remand to the circuit court is necessary to answer whether such facts were presented.

*277 III. CONCLUSION
¶ 41. We conclude that the proper pre-termination procedure for a tenured faculty member of the University of Wisconsin System is set out in Wis. Stat. § 36.13 and Wis. Admin. Code § UWS 4, which the Board correctly employed, and that there has been no showing that Marder's rights were compromised by alleged ex parte communications between the chancellor and Regent Marcovich or between the University of Wisconsin System counsel who advised the chancellor and the Board. However, based on the record before us, we cannot determine whether in the communication between the chancellor and the Board, which occurred immediately before the Board voted to terminate Marder, the chancellor presented new facts to the Board upon which its decision to terminate Marder was based. Therefore, we remand to the circuit court for the limited purpose of making that determination. We leave to the circuit court's discretion the decision of whether discovery is needed to determine whether the chancellor presented any new facts upon which Marder's termination was based. Accordingly, we affirm the decision of the court of appeals.
By the Court.The decision of the court of appeals is affirmed.
¶ 42. SHIRLEY S. ABRAHAMSON, C.J., and ANN WALSH BRADLEY, J., took no part.
*278 
NOTES
[] Motion for reconsideration filed 12-16-05.
[1] All subsequent references to the Wisconsin Statutes are to the 2003-04 version unless otherwise indicated.
[2] All subsequent references to the Wisconsin Administrative Code are to the April, 2001 version unless otherwise indicated.
[3] Wisconsin Admin. Code § UWS 4.04 reads, in pertinent part: "Hearing. If the faculty member requests a hearing ... such a hearing shall be held.... The request for a hearing shall be addressed in writing to the chairperson of the standing faculty committee created under s. UWS 4.03."
[4] Wisconsin Admin. Code § UWS 4.03 reads, in pertinent part: "Standing faculty committee. The faculty of each institution shall provide a standing committee charged with hearing dismissal cases and making recommendations under this chapter."
[5] Wisconsin Admin. Code § UWS 4.07 reads, in pertinent part:

Recommendations: to the chancellor: to the regents. (1) The faculty hearing committee shall send to the chancellor and to the faculty member concerned, as soon as practicable after conclusion of the hearing, a verbatim record of the testimony and a copy of its report, findings, and recommendations. The committee may determine that while adequate cause for discipline exists, some sanction less severe than dismissal is more appropriate. . . . If the chancellor's proposed recommendations differ substantially from those of the faculty hearing committee, the chancellor shall promptly consult the faculty hearing committee and provide the committee with a reasonable opportunity for a written response prior to forwarding his/her recommendation. If the recommendation is for dismissal, the recommendation shall be submitted through the president of the system to the board. A copy of the faculty hearing committee's report and recommendations shall be forwarded through the president of the system to the board along with the chancellor's recommendation.
[6] For example, the committee recommended that Marder be moved to another department based on his conflicts with other faculty in his own department. The chancellor pointed out that this was an unrealistic recommendation since Marder was not qualified to teach in any other department.
[7] Wisconsin Stat. § 227.42(1) provides:

(1) In addition to any other right provided by law, any person filing a written request with an agency for hearing shall have the right to a hearing which shall be treated as a contested case if:
(a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;
(b) There is no evidence of legislative intent that the interest is not to be protected;
(c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and
(d) There is a dispute of material fact.
[8] Wisconsin Stat. § 36.13(5) is the provision that is relevant here. It provides:

Procedural guarantees. Any person having tenure may be dismissed only for just cause and only after due notice and hearing. ... The action and decision of the board in such matters shall be final, subject to judicial review under ch. 227. The board and its several faculties shall develop procedures for the notice and hearing which shall be promulgated by rule under ch. 227.
[9] Marder contends that in order to be outside of ch. 227's contested case provisions, pre-termination proceedings for tenured faculty should have been listed in Wis. Stat. § 227.03(4). We conclude such a listing would have been redundant, given the plain statement the legislature set out in Wis. Stat. § 227.42(3) and Wis. Stat. § 36.13(5).