COURT OF APPEALS
DECISION
DATED AND FILED

March 7, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP397**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021CV602

**IN COURT OF APPEALS
DISTRICT I**

---

CITY OF MILWAUKEE BOARD OF FIRE AND POLICE COMMISSIONERS,

PETITIONER-RESPONDENT,

V.

NIKOLAS B. ZENS,

RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: CARL ASHLEY, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

¶1      BRASH, C.J.   Nikolas B. Zens appeals the order of the circuit court affirming the decision of the City of Milwaukee Board of Fire and Police Commissioners (the Board) to sustain charges against him of failing to stop after losing sight of a suspect during a foot pursuit, and failing to meet the target isolation

requirement before firing his weapon. Those charges resulted in Zens being disciplined with penalties that included a twenty-day suspension without pay for the first charge, and for the second charge, his discharge from the Milwaukee Police Department (MPD), both of which were upheld by the Board. Upon review, we affirm.

## BACKGROUND

¶2　Zens joined the MPD in December 2017. The incident that led to his discharge occurred in September 2019 and involved the pursuit of a suspect, which eventually led to Zens shooting a bystander. The incident began shortly after 1:00 a.m. on September 8, 2019, when officers attempted to stop a vehicle driven by Kevin Brown. Brown fled in his vehicle through residential neighborhoods on Milwaukee's north side; the pursuit lasted approximately nineteen minutes, covered nearly fourteen miles, and reached speeds of up to seventy miles per hour. Brown eventually struck an MPD squad car, and then abandoned his vehicle and fled on foot.

¶3　Zens saw Brown running across the front yards of houses and began pursuing Brown on foot. Zens stated that Brown was running in "a manner that concealed his hands in his front waist area, which is consistent with a person running while concealing or drawing a handgun." Zens also reported that Brown "briefly turned back toward him in a manner that made Zens believe that Brown was measuring Zens as a potential target." Zens repeatedly ordered Brown to stop and show his hands, but Brown refused.

2

¶4      Brown ran to the back door of a residence occupied by T.D.[1] and his family.  T.D. was standing at the back door as Brown attempted to enter the residence.  Zens stated that he saw Brown "raise his arms in a manner Zens perceived to be aiming a handgun toward him."  Zens then fired one shot toward Brown.  That shot, however, instead struck T.D. in his upper leg.  T.D. fell to the ground; Brown also dropped to the ground, and Zens then took Brown into custody.

¶5      T.D. later told police that his girlfriend's daughter, who was dating Brown, lives at his residence.  T.D. said that at the time of the pursuit, he was in his bedroom when he heard police sirens.  He then received a phone call from Brown; T.D. said he told Brown to "stop and pull over" because "it was not worth it."  T.D. went downstairs and saw the back door half open and went to close it, but Brown then pushed it open; that is when Zens fired.  T.D. stated that he did not know that Brown was at the back door, that he was not trying to help him, and that he did not want Brown in the house.

¶6      The shooting was investigated by the Milwaukee County District Attorney's Office (DA), which concluded that the shooting was not unreasonable under the circumstances. The DA noted that body camera footage of the foot pursuit demonstrated that Zens repeatedly ordered Brown to stop and show his hands, and that Brown did not comply.  The footage also showed that the lighting at the back of the house in contrast with the darkness of the yard made it difficult to discern Brown's actions during the pursuit.  However, Zens' statement that Brown's hands were "in his front waist area" was corroborated by Brown's statement to police, in

---

[1] We refer to T.D. by his initials as he is a victim in this case even though it is not technically mandated by statute, due to the type of underlying case. *See* WIS. STAT. RULE 809.86 (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

which Brown explained that he did not have a weapon—and none was recovered after the shooting—but that he was trying to put his cell phone in his front pants pocket. Additionally, the DA observed that one of T.D.'s family members had seen Brown's arm "somewhat outstretched" as he tried to enter the back door of the residence, as Zens had claimed.

¶7      Furthermore, these facts were in addition to Zens' knowledge at the time that Brown had "led police on a lengthy and dangerous vehicle pursuit through residential neighborhoods," and that people who flee from police are often armed with dangerous weapons. Therefore, the DA concluded that there was "no evidence to refute Zens' perceptions of the threat level presented by Brown at the time Zens fired one shot."

¶8      MPD's Internal Affairs Division (IAD) also conducted an administrative review of the shooting. IAD officers interviewed Zens about the shooting, and reviewed statements by Brown, T.D., T.D.'s family members, and other officers involved in Brown's pursuit. The IAD also considered a report on the incident prepared by the MPD Range Master as a "professional opinion" on the incident. The Range Master had responded to the shooting scene; he also reviewed the body camera footage and the statements made by Zens and another officer who was present during the pursuit.

¶9      The Range Master observed that the shooting scene was a culmination of Brown's actions which had "placed the community and officers in significant danger." The Range Master further noted that Zens had no way of knowing whether someone at the residence was going to assist Brown, which could increase the number of "hostile" subjects, or whether Brown was "forc[ing] his way into the residence" which could lead to a hostage situation.

¶10     Nevertheless, the Range Master recognized that Zens did not have "target isolation" when he shot at Brown due to the close proximity of T.D. According to the Firearms Guide published by the Wisconsin Department of Justice Law Enforcement Standards Board (LESB), target isolation is one of the requirements that must be met before the use of deadly force is permitted. Target isolation "means that you can shoot at your target without danger of harming innocent people."

¶11     However, the Range Master believed that the "greater danger exception" to the target isolation requirement was applicable here. This exception allows an officer to "shoot without target isolation if the consequence of not stopping the threat would be *worse* than the possibility of hitting an innocent person." Based on the circumstances surrounding the shooting, namely Brown's conduct—"the danger [Brown] manifested by his actions, his inactions to following official orders by police, along with the danger signs exhibited with his movements"— the Range Master opined that it "could be reasonable to see a greater danger to [Zens] if he did not fire."

¶12     The IAD report was reviewed by Lt. Liam Looney of the MPD for possible disciplinary charges. Lt. Looney concluded that Zens' use of deadly force was justified in that situation. However, Lt. Looney further concluded that Zens had not followed MPD policies with regard to foot pursuits, particularly with regard to Zens' admission that during the chase, Brown had turned a corner and Zens "lost sight of [Brown] for half a second" but continued the pursuit. According to the Tactical Response Guide, also published by the LESB, officers pursuing a suspect on foot who they believe is armed should consider their circumstances, such as whether they have "sufficient cover or distance" from the suspect, to determine if they can safely pursue the suspect. Furthermore, officers should reassess the

situation if they lose sight of the suspect, due to the risk of "blindly running into an unforeseen ambush, trap, or assault."

¶13 Lt. Looney determined that Zens did not follow this protocol in his pursuit of Brown. Specifically, Lt. Looney stated that Zens "did not stop after he lost sight of the suspect nor did he keep a reaction distance, which would have allowed him to disengage." Lt. Looney further determined that Zens did not follow the requirement for target isolation. As a result, Lt. Looney believed that charges against Zens for violating MPD policies were warranted.

¶14 Zens was thus charged with violations of MPD's Code of Conduct regarding his actions during the pursuit and shooting. In July 2020, then-Chief of Police Alfonso Morales found that the charges were substantiated, and imposed the following penalties: for Zens' failure to stop after losing sight of Brown during the foot pursuit, a twenty-day suspension without pay; and for Zens' failure to meet the target isolation requirement, he was discharged from the MPD.

¶15 Zens appealed this decision with the Board, and a hearing was held over several days in December 2020. Zens argued that he did not violate MPD policies because the guidelines set forth by the LESB allow for "varying tactics based upon the situation and environment." Zens further asserted that the greater danger exception to the target isolation requirement should be applied in this case.

¶16 However, Lt. Looney testified that although he had found that the shooting was justified, Zens' actions during the pursuit were "inconsistent with his training," and therefore were not justified. The inconsistencies were demonstrated by Zens' admission that he lost sight of Brown for "a half second," but continued the chase "because of fear and adrenaline" and because Zens "wanted to get [Brown] into custody." Furthermore, Inspector Paul Formolo, who testified as to Chief

Morales's reasoning for the disciplinary decision, explained that the guidelines indicate that officers should "remain flexible" during a pursuit, and "not allow [themselves] to be sucked into a mindset of 'I'm going to catch this guy at any cost.' Be smart and don't overcommit." Inspector Formolo said that Zens' decision to "charge ahead after losing sight" of Brown "resulted in a confrontation that endangered [Zens] and the lives of Brown and [T.D.] because he limited his options to respond." In short, had Zens followed the guidelines, the shooting "might have been prevented."

¶17 The Board found that there was just cause to sustain the charges against Zens, and upheld the discipline imposed by Chief Morales. The Board acknowledged that there were opposing views as to whether Zens had violated the LESB guidelines, specifically between Zens and the Range Master in contrast with Lt. Looney's opinion and Inspector Formolo's testimony on behalf of Chief Morales. However, the Board agreed with the positions of Lt. Looney and Inspector Formolo, and stated that there was sufficient evidence in the record to support their opinions.

¶18 The Board further found that the discipline imposed by Chief Morales "reasonably relate[d]" to the seriousness of the incident, based on the "degree of harm;" that is, because Zens did not follow the guidelines, he had limited his options to respond to the situation and, as a result, an innocent bystander had been shot and seriously injured. The Board further noted that there had been a previous incident approximately two months prior to this shooting where Zens was involved in a foot

pursuit; he swore at the suspect and yelled several times, "I'm going to shoot you."[2] Zens was not disciplined for this conduct, but rather was "counseled." The Board observed that decisions relating to discipline may also take into account the service record of the officer, so this incident was properly considered.

¶19 Zens then appealed the Board's decision to the circuit court. Zens' appeal included both a statutory argument pursuant to WIS. STAT. § 62.50 relating to the "just cause" factors for sustaining charges against a police officer, as well as a certiorari review where he asserted that the Board had proceeded on an incorrect theory of law and exceeded its jurisdiction in its decision to uphold Zens' termination from the MPD.

¶20 The circuit court reviewed all of the "just cause" factors set forth in WIS. STAT. § 62.50(17)(b), as well as Zens' certiorari arguments. The court rejected Zens' arguments and affirmed the Board's decision. This appeal follows.

## DISCUSSION

¶21 For a certiorari review, this court reviews the decision of the Board, not that of the circuit court. *Vidmar v. Milwaukee City Bd. of Fire Police Comm'rs*, 2016 WI App 93, ¶13, 372 Wis. 2d 701, 889 N.W.2d 443. Our review on certiorari is generally "limited to whether the Board '(1) acted within its jurisdiction; (2) proceeded on a correct theory of law; (3) was arbitrary, oppressive, or unreasonable; or (4) might have reasonably made the order or finding that it made based on the evidence.'" *See Sliwinski v. Board of Fire & Police Comm'rs of City*

---

[2] Inspector Formolo testified regarding this incident based on a report. He initially testified that Zens had yelled, "stop or I'll shoot you in the back." In subsequent testimony, however, Inspector Formolo admitted that he had testified inaccurately, as the report regarding the incident does not quote Zens as stating he would shoot the suspect in the back; rather, Zens is quoted as shouting "I'm going to shoot you," as noted by the Board in its conclusions of law.

*of Milwaukee*, 2006 WI App 27, ¶12, 289 Wis. 2d 422, 711 N.W.2d 271 (citation omitted).

¶22 However, as previously noted, the review of this matter by the circuit court involved both a statutory review pursuant to WIS. STAT. § 62.50 as well as a certiorari review. Therefore, this court's review "is limited to whether the Board kept within its jurisdiction or applied correct legal theories, because a circuit court's decision on a review sought under [§ 62.50] upholding a Board's action 'shall be final and conclusive in all cases.'" *Sliwinski*, 289 Wis. 2d 422, ¶12 (quoting § 62.50(22)). "Whether the Board kept within its jurisdiction or applied correct legal theories are questions of law we review *de novo*." *Vidmar*, 372 Wis. 2d 701, ¶13.

### *Due Process Claims*

¶23 Zens first argues that his right to due process was violated by the Board's decision. These arguments fall under the category of review regarding whether the Board applied correct theories of law. *See Marris v. City of Cedarburg*, 176 Wis. 2d 14, 24, 498 N.W.2d 842 (1993) ("[t]he phrase 'acted according to law' has been interpreted as including 'the common-law concepts of due process and fair play'" (citations omitted)).

¶24 However, despite Zens' characterization of his claims, the substance of his arguments instead questions the credibility of the witnesses and whether the evidence was sufficiently substantial to support the Board's decision. Zens discusses at length the evidence that was submitted in this case and why it should have been weighed differently—that is, in his favor. He continues to conflate the standard of review by arguing that the Board proceeded on an incorrect theory of law and acted outside its jurisdiction with regard to its application of the facts here

to the LESB guidelines, particularly relating to the requirement of target isolation and whether the greater danger exception was applicable, with repeated references to the just cause standards of WIS. STAT. § 62.50(17)(b), under which evidentiary issues are reviewed.

¶25 As explained above, the review of evidentiary issues is outside the scope of our review. The circuit court has already reviewed the evidence as it pertained to the just cause factors, and we are "precluded from reviewing … evidence-based argument[s] on appeal." *See Vidmar*, 372 Wis. 2d 701, ¶25. We therefore decline to review Zens' arguments in that regard.

¶26 Zens also makes a due process argument that the Board was biased against him. "A basic element of constitutional due process … is a fair hearing conducted before a fair tribunal." *Marder v. Board of Regents of Univ. of Wis. Sys.*, 2005 WI 159, ¶27, 286 Wis. 2d 252, 706 N.W.2d 110. "[A]n adjudicator in an administrative hearing comes within the ambit of the due process requirement of an unbiased decision-maker." *Id.*

¶27 "[T]he party alleging bias assumes a heavy burden of showing unfairness." *State ex rel. Kalt v. Board of Fire & Police Comm'rs for City of Milwaukee*, 145 Wis. 2d 504, 513, 427 N.W.2d 408 (Ct. App. 1988). Specifically, that party "must overcome the presumption of honesty and integrity in those serving as adjudicators[.]" *Id.* at 513-14 (citation omitted). A "strong showing" is necessary to rebut this presumption, such as demonstrating that an adjudicator had "become 'psychologically wedded' to a predetermined disposition of the case." *Nu-Roc Nursing Home, Inc. v. DHSS*, 200 Wis. 2d 405, 420, 546 N.W.2d 562 (Ct. App. 1996) (citation omitted).

¶28 In support of his argument, Zens points to a directive from the Board to Chief Morales issued on July 20, 2020, in which the Board demanded a "full, open, and public explanation" of the shooting within seven days of that directive. Zens asserts that Lt. Looney's report recommending charges against Zens was issued the next day—on July 21, 2020—suggesting that Lt. Looney's recommendation was in direct response to the Board's directive. However, Lt. Looney's report is dated July 13, 2020—a week before the directive issued by the Board.[3]

¶29 Furthermore, Zens points to the "concerns" of one of the Board's commissioners, Steven DeVougas, regarding the shooting, which he began "publicly voicing" in the months preceding the charges against Zens. However, a commissioner expressing concern over the accidental shooting of an innocent bystander by an MPD officer should, frankly, be expected, and does not demonstrate that he was "psychologically wedded" to a particular outcome in the case. *See id.* Moreover, Commissioner DeVougas was not involved in the hearing in Zens' case.

¶30 We therefore conclude that Zens has not overcome the presumption that the Board acted with honesty and integrity. *See **Kalt***, 145 Wis. 2d at 513-14. Accordingly, we reject his due process argument of bias by the Board.

*Jurisdiction Claim*

¶31 Zens next argues that the Board exceeded its jurisdiction when it issued its written decision in this matter more than ten days after the hearing.

---

[3] The July 21, 2020 date referenced by Zens appears in a stamp at the end of Lt. Looney's report, and seems to indicate when the report was internally reviewed.

Pursuant to the Rules of the Board of Fire and Police Commissioners—specifically, Rule XVI § 10(f) relating to procedures for a trial before the Board—"[a] written decision will be signed by Board members who participated in the decision within ten (10) days after such decision is rendered[.]"[4]  The final date of Zens' hearing was December 28, 2020, when the Board made an oral decision on this matter.  The Board's written decision was signed by two of the commissioners on January 5, 2021, eight days after the oral decision; however, the third commissioner did not sign until January 14, 2021, which was outside of the ten-day window set forth in Rule XVI § 10(f).

¶32    "[T]he rules of construction for statutes have been long held applicable to the construction of municipal ordinances[.]" *State ex rel. B'nai B'rith Found. of U.S. v. Walworth Cnty. Bd. of Adjustment*, 59 Wis. 2d 296, 308, 208 N.W.2d 113 (1973).  Statutory interpretation and applying a statute to a set of facts—or, in this case, interpreting and applying a municipal rule—are questions of law which this court reviews *de novo*.  *State v. Bodoh*, 226 Wis. 2d 718, 724, 595 N.W.2d 330 (1999).

¶33    First, we note that Rule XVI § 10(f) regarding the time constraints for a written decision is purely an administrative rule; there is no corresponding statutory time requirement set forth in WIS. STAT. § 62.50.  "'[A]bsent a mandatory requirement, administrative delay in issuing a decision is not reversible error' on due process grounds." *Koenig v. Pierce Cnty. DHS*, 2016 WI App 23, ¶39, 367 Wis. 2d 633, 877 N.W.2d 632 (citations omitted; brackets in *Koenig*).  Furthermore, even when there is a statute which specifies a time frame during which an agency is

---

[4] We may take judicial notice of the Rules of the Board of Fire and Police Commissioners pursuant to WIS. STAT. § 902.01.

to act, that time frame is "directory" as opposed to mandatory, "unless the statute denies the exercise of power after such time or the nature of the action or the statutory language shows the time was meant to be a limitation." *Kruczek v. DWD*, 2005 WI App 12, ¶14, 278 Wis. 2d 563, 692 N.W.2d 286.

¶34     There is nothing in Rule XVI § 10(f) that suggests the Board loses its jurisdiction over a matter if it fails to issue a written decision outside of the ten-day time frame set forth in the Rule. *See Kruczek*, 278 Wis. 2d 563, ¶22. We therefore conclude that the time frame set forth in Rule XVI § 10(f) is directory, and we consequently reject Zens' argument that the Board exceeded its jurisdiction when it issued its written decision outside of the ten-day time frame of Rule XVI § 10(f).

*Erroneous Standard of Review Claim*

¶35     Finally, Zens argues that the circuit court employed the wrong standard of review in its review of his case, requiring reversal of its decision. As explained above, Zens initiated his appeal with the circuit court under both a statutory review pursuant to WIS. STAT. § 62.50 as well as a certiorari review, and the circuit court reviewed his evidentiary issues pursuant to the just cause standards of § 62.50(17)(b). For that review, the circuit court had to "defer to credibility determinations made by those who hear and see the witnesses because of the latter's 'superior opportunity ... to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony.'" *Younglove v. City of Oak Creek Fire & Police Comm'n*, 218 Wis. 2d 133, 140, 579 N.W.2d 294 (Ct. App. 1998) (citation omitted; ellipses in *Younglove*). The decision by the circuit court demonstrates that it followed this standard in its statutory review of the evidence. We therefore reject Zens' argument.

13

¶36 In sum, we reject all of Zens' claims raised in this appeal regarding whether the Board kept within its jurisdiction or applied correct legal theories, which is the scope of our review. *See Sliwinski*, 289 Wis. 2d 422, ¶12. Accordingly, we affirm the circuit court's decision upholding the decision of the Board.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.